FILED
United States Court of Appeals
Tenth Circuit

February 6, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

IN RE: LEVEL 3 COMMUNICATIONS, INC. SECURITIES LITIGATION,

No. 11-1029

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. Nos. 1:09-CV-00200-PAB-CBS
1:09-CV-00215-PAB-CBS
1:09-CV-00296-PAB-CBS
1:09-CV-00606-PAB-CBS)

---

Susan K. Alexander of Robbins Geller Rudman & Dowd LLP, San Francisco, California (Sanford Svetcov of Robbins Geller Rudman & Dowd LLP, San Francisco, California; Henry Rosen, Trig R. Smith, Laurie L. Largent and Julie A. Kearns of Robbins Geller Rudman & Dowd LLP, San Diego, California; Francis A. Bottini, Jr. of Johnson Bottini, LLP, San Diego, California; Robert J. Dyer III and Jeffrey A. Berens of Dyer & Berens LLP, Denver, Colorado, with her on the briefs), for Plaintiff-Appellant, William A. Poppo.

Jordan Eth of Morrison & Foerster LLP, San Francisco, California (Brian R. Matsui and Kevin A. Calia of Morrison & Foerster LLP, San Francisco, California; Lila M. Bateman of Morrison & Foerster LLP, Denver, Colorado, with him on the brief), for Defendants-Appellees, Level 3 Communications, Inc., James Q. Crowe, Kevin J. O'Hara, Sunit S. Patel, Walter Scott, Jr., and Charles "Buddy" C. Miller, III.

---

Before **BRISCOE,** Chief Judge, **BALDOCK,** and **HOLMES**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

This case arises from allegations that certain officers of Level 3 Communications, Inc. (Level 3) engaged in securities fraud. Lead plaintiff William A. Poppo filed a class action complaint on behalf of all purchasers or acquirers of Level 3 securities between October 17, 2006, and October 23, 2007 (the class period).[1] Plaintiff sued the defendants[2] under Section 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff also asserted claims against individual defendants as "control persons" pursuant to Section 20(a) of the Act, 15 U.S.C. § 78t(a). The district court dismissed the complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), and plaintiff appeals. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.

Under Section 10(b) of the Securities Exchange Act of 1934 (SEA), it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Implementing the

---

[1] This case was initially brought as four separate class actions, which the district consolidated into the present action.

[2] The defendants named in the consolidated class action are: (1) Walter M. Scott, Jr., the chairman of the board of directors at Level 3; (2) Charles C. Miller, III, the vice chairman of the board of directors and executive vice president at Level 3; (3) Kevin J. O'Hara, Level 3's chief operating officer (COO); (4) James Q. Crowe, Level 3's chief executive officer (CEO); (5) Sunit S. Patel, Level 3's chief financial officer (CFO); and (6) Level 3.

SEA, Rule 10b-5 prohibits, inter alia, "mak[ing] any untrue statement of a material fact." 17 C.F.R. § 240.10b-5.

"Section 10(b) . . . affords a right of action to purchasers or sellers of securities injured by its violation." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318 (2007). A plaintiff suing under Section 10(b), however, bears a heavy burden at the pleading stage. In order to state a private securities fraud claim, a plaintiff's complaint must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003).

Under the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, 109 Stat. 737, a heightened pleading standard applies to the first and third of these elements. Adams, 340 F.3d at 1095–96. In order to overcome a motion to dismiss, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, it is not enough for a plaintiff to allege generally that the defendant acted with scienter, as permitted under Fed. R. Civ. P. 9(b). The plaintiff must, "with respect to each act or omission alleged . . .

3

, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Plaintiff alleges that defendants made false or misleading statements of material fact to the market during the class period regarding Level 3's progress in integrating several entities it had acquired. In this appeal from defendants' motion to dismiss, we accept as true all well-pleaded facts. Adams, 340 F.3d at 1088. The facts pertinent to our decision are as follows.

## A. Overview

Level 3 is a publicly traded company that primarily provides telecommunications services to business customers such as telephone companies, cable television companies, and internet service providers. As one of its services, Level 3 operates fiber optic networks to allow its customers to transfer data as well as voice and video communications. Between December 2005 and January 2007, the company sought to expand its network through a series of acquisitions. On December 23, 2005, Level 3 acquired WilTel Communications Group, LLC (WilTel), which operated a "long haul" network.[3] Then, between March 20, 2006, and August 2, 2006, Level 3 acquired four entities that operated "metropolitan" or "metro" networks[4]: Progress Telecom (Progress), ICG Communications, Inc. (ICG), TelCove, Inc. (TelCove), and Looking Glass Networks

---

[3] "Long haul" networks allow customers to transfer significant amounts of data between cities. Aplee. Br. at 4.

[4] "Metro" networks connect customers within cities to the "long haul" networks. Aplee. Br. at 4.

Holdings Co., Inc. (Looking Glass).  Finally, on January 3, 2007, Level 3 acquired

Broadwing Corporation (Broadwing), which operated a long haul network.  This case is

primarily about Level 3's attempts to integrate into its business the first of these

acquisitions, WilTel, and defendants' representations to the market about that process.

*B. Level 3's Anticipated Network Integration Process*

As Level 3 acquired telecommunications companies, it faced the significant task of

merging the new systems with its own.  According to the amended complaint, Level 3

had a multiple-step network integration process in place "to facilitate the combination of

the acquired businesses' physical network[s] with that of Level 3's then existing assets."

JA, Vol. 1 at A83.  The first step in the process was physical network analysis.  Id. at

A84.  "[D]uring this phase[,] . . . Level 3 determined where network 'circuits'[5] were

physically located, the design of circuits, what equipment had been utilized to 'light'

circuits,[6] and which circuits were leased or owned."  Id. at A84.[7]  The second step was

identification of network efficiencies.  Id.  "During this phase . . . , Level 3 merely

identified where redundant network elements existed and might be later targeted for

---

[5] According to the complaint, a "circuit" is a "reference to a piece of fiber-optic cable that originates at a physical location . . . and terminates at another location." JA, Vol. 1 at A84 n.3.

[6] A "lit" circuit is a "fiber-optic cable with electronic equipment attached to it and capable of transporting information."  JA, Vol. 1 at A84 n.3.  A "dark" circuit has no electronic equipment attached.  Id.

[7] Except where noted otherwise, in our quotations from the record, all internal quotation marks and emphases are omitted.

elimination." Id. The third step was network design. Id. Here, Level 3 sought to "design the most optimal and efficient combined network." Id. The fourth step involved building interconnects and capacity. Id. This was "the single most time intensive and challenging . . . phase," and it involved "physically joining elements of the network, such as . . . WilTel's and Level 3's networks . . . [and] connecting dark fiber to laser equipment to create operating circuits." Id. at A85. The final network integration step was route integration. Id. During this phase, "network redundancies identified earlier . . . are . . . physically decommissioned and customers can be moved onto new, more cost-efficient network infrastructure." Id. at A85.

By the end of 2007, defendants hoped to transfer "all the complex business systems utilized by the acquired businesses (referred to as the 'legacy' systems) onto a common operating platform." Id. at A78, A89. Ultimately, Level 3 intended to achieve fluid "provisioning"—the "end to end process starting with a signed sales order and ending with field installation, testing and activation of service necessary to begin billing"—across all the acquired networks. Id. at A78.

*C. Integration Issues*

The integration process, plaintiff alleges, was mismanaged from the start. According to the complaint, physical integration of the acquired entities' networks proceeded behind schedule and over budget. Id. at A59. Level 3 failed to integrate the acquired entities' inventory control and provisioning systems, and as a result found itself "simultaneously using multiple network inventory and provisioning systems acquired

6

from WilTel and the metro businesses, resulting in significant delays in provisioning and fulfilling customer orders." Id. at A61. Furthermore, Level 3 failed "to accurately map the acquired businesses' networks and inventory control and provisioning systems." Id. at A66.

Plaintiff alleges that these basic problems arose because defendants "fired the sales personnel employed by the acquired businesses who were familiar with products and customers as well as the technical experts who had knowledge of and were responsible for provisioning orders and activating sales." Id. at A60. The "remaining Level 3 employees had difficulty understanding the functionality of" the legacy systems and were not given adequate training "to work within the numerous order tracking and provisioning systems being used to fill customers' orders." Id. at A60–61. Further, Level 3 "had no experienced personnel to accurately map the acquired businesses' networks and inventory control and provisioning systems and as a result [it] was . . . unable to determine what portions of the acquired businesses' network elements were redundant . . . or unnecessary." Id. at A61, A66.

*D. Defendants' Statements During the Class Period*

Mismanagement is not equal to fraud, however, and plaintiff emphasizes that this action is not about how well or how poorly defendants handled the integration of Level 3's acquisitions. Rather, plaintiff's fraud claim is based on alleged misrepresentations defendants made regarding the success of that endeavor. The complaint provided a catalog of allegedly false or misleading statements.

7

For instance, on October 17, 2006, ten months after Level 3 had acquired WilTel, COO O'Hara spoke favorably about the progress the company had made. "We continue to run ahead of plan," he told analysts and investors, "and have now completed the majority of integration efforts from WilTel, and we have completed these activities under budget." Id. at A53–54. A week later, O'Hara reiterated that Level 3 "continue[d] to run ahead of plan on the WilTel integration from both a timing and budget perspective." Id. at A55. He stated that "[a] majority of the physical network interconnections are completed." Id. These claims were repeated and exaggerated by market analysts. See, e.g., id. at A55 ("Management stated that it had completed the integration of Wil[T]el.").

Level 3 emphasized to the market that it was working hard on integration. CEO Crowe stated, "'We have [been] working on integration tasks and it's well over 200 people, so it's a big effort for us, one we take seriously and one we think we are developing pretty good skills in.'" Id. (alteration in original). On November 9, 2006, Level 3's Form 10-Q, filed with the Securities & Exchange Commission (SEC), stated that "[d]uring 2006, the Company integrated a significant portion of WilTel into the business." Id. at A57. On December 4, CFO Patel gave a more precise estimate. Before inquiring about Level 3's metro acquisitions, a financial analyst commented, "On the WilTel side, I think you are pretty much through the woods, you said you completed that in about a year, under budget and under schedule." Id. Patel replied, "You are right on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts." Id. Patel also presented a PowerPoint slide that proclaimed that "Level 3

8

is a logical consolidator with proven integration experience," a statement that was displayed at conferences on six other occasions by Patel, O'Hara, and Level 3's senior vice president and treasurer.  Id. at A58, A62–64, A68.

O'Hara continued to make positive statements about integration progress in 2007. On February 8, 2007, he stated that "integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions. . . .  Most of the physical integration of WilTel is now complete.  The remaining activities for WilTel are primarily tied to ongoing IT system development work."  Id. at A62–63.

In late April, O'Hara reiterated that Level 3 had "made significant progress on the integration of all acquisitions."  Id. at A67.  But he also offered a few cautions:

> As I mentioned earlier, a key objective during the integration process[] is to make sure that we do not compromise our sales momentum.  We are equally focused on insuring that the excellent reputation that Level 3 has earned over the years for customer service does not get degraded.  It is inevitable that as employees from seven companies learn new business processes and systems, that some inefficiency will be incurred during the transition.
>
> The overall integration effort is tracking within expectations in this regard, and the overall customer experience is still positive.  But this is an area that we are monitoring closely.

Id. at A67.  To that, Crowe added:

> With respect to our progress in integrating the acquisition we have made, [O'Hara] did a good job of explaining our current status in some detail. I would like to emphasize three points.  We understand that this job is our operational challenge and our opportunity and it is job #1, and we are determined to insure that Level 3 ends 2007 with one network platform, one

9

set of business processes, and most importantly, with an organization with one set of common values.

Id. at A68. Patel echoed these views in May 2007: "Over the last year and a half we have been very busy on acquisitions, I think we picked up about 7 companies. So this year is really focused on integration and getting the synergies from all those acquisitions. So that is really our top priority." Id.

In July 2007, the market received more cautious statements from Level 3. O'Hara repeated that Level 3 had "made significant progress on the integration of all acquisitions." Id. at A72. But he explained, "As we develop these new processes and systems, we're often working in a hybrid systems environment that has elements of both the legacy Level 3 systems, as well as various systems from the seven acquisitions." Id. "Operating in this interim environment has added operational complexity to certain functions. As a result of this complexity, the average period of time it takes to convert certain new service orders into revenue has been extended by up to 50 to 75%. . . . While this is the most complex part of the integration, we remain confident in our end-state architecture and will make meaningful progress toward our end-state environment during the balance of 2007." Id. at A73. Crowe also warned, "We are into this a couple of quarters and we are expecting a couple of more quarters of heavy effort." Id. Still, he said he was "confident, to go right to the point, because all of the issues that we're dealing with are under our control." Id.

10

*E. Disclosure on October 23, 2007*

On October 23, 2007, the last day of the class period, defendants disclosed that while Level 3 had strong sales, its provisioning capabilities were constrained as a result of the ongoing integration efforts. During a conference call with analysts and investors, defendants announced reductions to Level 3's financial forecasts for the fourth quarter of fiscal year 2007 and for the fiscal year 2008. Crowe explained:

> I'll now turn to what we view are the root causes of this problem. . . . When several services in several different locations are ordered by a customer, the provisioning process can require considerable effort and expertise to accomplish effectively and at scale. Level 3 in each of the six network companies we acquired in 2006 and 2007 had the same general process but the specifics differed among the companies.
>
> For quite some time, we've had a plan to move all sales and service to one unified set of processes and systems . . . . The . . . program developed and started in 2006 and is well along. . . . A significant amount of our integration spending this year is on the . . . effort, and we expect better provisioning throughput and significantly lower unit costs as we move forward. In the interim, we plan to increase the throughput of the seven legacy sales and service activation systems, in part by developing temporary process in systems [sic] that made using those individual systems simpler, and in part by assigning more people and other resources than would be needed by a more efficient system.

Id. at A78.

O'Hara explained that "[t]he integration is going well in all of the other areas. The really complicated stuff, though, is the service delivery and service management, those two are related because of their reliance in underlying systems. So, the physical network integration, the real estate integration, all of the people side of things are all progressing well." Id. at A81. "There's a long tail in some of those items," O'Hara said. Id.

11

On October 16, 2006, at the beginning of the class period, Level 3's stock price closed at $5.32 per share. Id. at A54. During the period, Level 3 stock traded as high as $6.75. Id. at A147. On October 22, 2007, the price was $4.32 per share. Following defendants' announcements, on October 23, Level 3 fell to $3.28 and then to $3.18 on October 24, resulting in a loss of approximately $1.76 billion in market capitalization in two days. Id. at A81.

### F. Plaintiff's Allegations

Plaintiff alleges that defendants committed securities fraud pursuant to Section 10(b) of the Act and Rule 10b-5. Id. at A154. Plaintiff also asserts claims against the individual defendants as "control persons" pursuant to Section 20(a) of the Act. Id. at A158.

With regard to the securities fraud claims, plaintiff alleges that "[d]efendants deliberately misled the market regarding Level 3's successful integration of WilTel . . . and the metro . . . acquisitions." Id. at A86. Plaintiff states that "[d]efendants' statements that the WilTel integration was complete and [that] the metro . . . acquisitions were on track were blatantly false and were purposefully designed to mislead the market into believing Level 3 was a successful integrator." Id. To demonstrate the falsity of defendants' claims, plaintiff provides statements from confidential witnesses regarding the actual progress of Level 3's integration efforts and identifies several internal Level 3 reports that tracked the status of the integration. Id. at A86–100, A130–33.

12

Plaintiff asserts that defendants knew their statements were false when made. Id. at A98. Defendants "were intimately involved in and continuously kept informed of all aspects of Level 3's network integration of WilTel, the metro . . . companies, and Broadwing." Id. at A130. According to plaintiff, defendants received or had access to several recurring reports documenting the integration progress, id., and O'Hara directly oversaw integration, id. at A134. Plaintiff also alleges that "defendants were aware of the customer complaints stemming from the order provisioning problems." Id. at A135. Further, plaintiff alleges that, in disclosures after the class period, defendants admitted to having had knowledge of the integration issues during the class period. Id. at A137–38.

Plaintiff argues that several motives drove defendants to commit fraud. First, they desired "[to] complete the Broadwing acquisition on more favorable terms, i.e., using less stock than [Level 3] would have had the truth about the integration status been known to investors; and . . . [to] refinance millions [of dollars] in existing debt at more favorable interest rates." Id. at A138. Further, plaintiff contends that defendants Crowe, Patel, O'Hara, and Miller "were highly motivated by the terms of Level 3's incentive compensation plans, which tied large portions of their compensation directly to the successful integration of WilTel and the acquired businesses and the performance of [Level 3's] stock price." Id. at A139–40. Plaintiff also states that defendants sold Level 3 shares during the class period based on the undisclosed information concerning the integration efforts. Id. at A142–45.

13

Relying on a fraud-on-the-market theory, plaintiff alleges that Level 3's stock price during the class period was artificially inflated due to defendants' false or misleading statements. Id. at A151–52. Plaintiff further asserts that "[t]he economic loss, i.e., damages, suffered . . . was a direct result of defendants' fraudulent scheme to artificially inflate the price of Level 3's securities . . . and the subsequent significant decline in the value of Level 3's stock when defendants' prior misrepresentations and omissions were revealed." Id. at A150.

## G. District Court Proceedings

Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court ruled that plaintiff had not properly stated a claim under Section 10(b) of the Act and dismissed the complaint with prejudice. Within the 135 pages of plaintiff's complaint, the court explained, it could not find a single material misstatement. Rather, the court concluded, "[t]he complaint tells a story of executives who, while recognizing some difficulties with integration, were optimistic about their ability to address those inefficiencies promptly and reap the benefits of integrating the acquired companies." JA, Vol. IV at A1214. "These aspirational statements were not material misstatements." Id.

Furthermore, the court explained, even if defendants had made material misstatements, plaintiff also had to allege facts raising a strong inference that they did so with scienter—"that is, with intent to defraud or recklessness." Id. at A1211 (quoting Adams, 340 F.3d at 1095). The court determined that "the complaint lack[ed] factual

14

allegations supporting a strong inference of scienter, if any inference at all." Id. at

A1214. "Because plaintiff . . . failed to plead a primary violation of the securities laws,"

the district court concluded that "he also . . . failed to plead a Section 20(a) violation." Id.

at A1217 n.10 (internal quotation marks omitted).

## II.

"We review de novo the district court's dismissal under [Rule] 12(b)(6) for failure

to state a claim upon which relief can be granted," Adams, 340 F.3d at 1092, accepting all

well-pleaded factual allegations in the complaint as true and construing them in the light

most favorable to the plaintiff, Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir.

1997). On appeal, plaintiff argues that the district court should be reversed because the

amended complaint adequately pleaded false statements of material fact made by

defendants, as well as facts sufficient to raise a strong inference of scienter. Although we

agree with plaintiff that at least a few of the complaint's 237 paragraphs include

materially false statements, we affirm the district court's dismissal of the complaint based

on our conclusion that it fails adequately to plead scienter.

### A. Materiality

We address first the district court's conclusion that the complaint failed to plead

materially false or misleading statements.[8] "A statement or omission is only material if a

---

[8] The district court considered dismissing the complaint as an incomprehensible
"puzzle pleading" that failed to properly state a "short and plain statement of the claim"
pursuant to Federal Rule of Civil Procedure 8(a). JA, Vol. 4 at A1208. In particular, the
(continued...)

15

reasonable investor would consider it important in determining whether to buy or sell stock." Grossman, 120 F.3d at 1119. In this regard, we have distinguished between statements that are material and those that are "mere puffing . . . not capable of objective verification." Id. (internal quotation marks omitted). "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." Id.

As defendants clearly recognized, reasonable investors wanted to know how Level 3's integration efforts were progressing in 2006 and 2007. "I do know this is an important matter to many of our investors," Crowe said at the outset of the class period. JA, Vol. 1 at A54. And investors had good reason to care about whether Level 3 was capable of successfully integrating a network like WilTel: throughout the class period, Level 3 continued to engage in large-scale integration of other acquisitions.

### 1. Immaterial Statements

The importance of integration to Level 3 and its investors does not, however, mean that everything defendants said on the topic was material. Many of the statements in plaintiff's complaint are, as a matter of law, nothing more than puffery. For instance,

---

[8](...continued)
court disapproved of plaintiff's tendency to "excerpt[] long passages including numerous statements and, to a large degree, leave[] the Court to the task of teasing out which specific statements are at issue." Id. at A1212. We join in this disapproval. Having managed to "teas[e] out" the most relevant statements from plaintiff's lengthy complaint, however, we do not address here whether or how Rule 8(a)'s "short and plain statement of the claim" requirement applies in conjunction with the heightened pleading standards of private securities fraud actions.

16

defendants' representations regarding Level 3's integration skills, such as that "Level 3 is a logical consolidator with proven integration experience," JA, Vol. 1 at A58, A63, A64, A68, are simply incapable of objective verification. Similarly, the assertion that "this year is really focused on integration and getting synergies from all those acquisitions," id. at A68, must be characterized as vague (if not meaningless) management-speak upon which no reasonable investor would base a trading decision. See Grossman, 120 F.3d at 1121–22. We also include in this category defendants' general, forward-looking expressions of confidence in future integration progress. See, e.g., JA, Vol. 1 at A67 ("We are equally focused on insuring that the excellent reputation that Level 3 has earned over the years for customer service does not get degraded."); id. at A73 ("[W]e remain confident in our end-state architecture and will make meaningful progress toward our end-state environment during the balance of 2007.").

Finally, broad claims by defendants regarding integration efforts and the customer experience overall are likewise non-actionable. See, e.g., id. at A62 ("The integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from those transactions."); id. at A67 ("The overall integration effort is tracking within expectations in this regard, and the overall customer experience is still positive."). These are all the "kind of rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity . . . that no reasonable investor could find them important." Ind. State Dist. Council of Laborers and Hod Carriers Pension & Welfare

Fund v. Omnicare, Inc., 583 F.3d 935, 944 (6th Cir. 2009); see also In re Cutera Sec. Litig., 610 F.3d 1103, 1110 (9th Cir. 2010) (concluding that "we believe our employee relations are good" was a nonactionable, "mildly optimistic, subjective assessment").

### 2. Material Statements

Nonetheless, on occasion defendants' comments regarding Level 3's integration progress did cross the line from corporate optimism and puffery to objectively verifiable matters of fact. On appeal, plaintiff points to eight examples of materially false or misleading statements found in the amended complaint. Aplt. Br. at 46–47. We consider four of these statements to be particularly concrete, and thus potentially actionable. First, defendant O'Hara stated on October 17, 2006 that the majority of WilTel integration was complete, "ahead of plan" and "under budget." JA, Vol. 1 at A53–54. Second, O'Hara also said on October 24 that "[a] majority of the physical network interconnections are completed." Id. at A55. Third, on December 4, Patel claimed that "on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts." Id. at A57. Fourth, in February 2007, O'Hara said, "Most of the physical integration of WilTel is now complete." Id. at A63. We disagree with the district court's conclusion that these claims were merely "aspirational statements [and] not material misstatements." Id., Vol. 4 at A1214. "[E]ach of these statements could have, and should have had, some basis in objective and verifiable fact." Grossman, 120 F.3d at 1123.

### B. Falsity

Having "distill[ed] out the immaterial portions of the statements of which

18

[plaintiff] complains," id., we must decide whether the complaint specifies "the reason or reasons why th[e] [remaining] statements are misleading." Adams, 340 F.3d at 1097 (citing 15 U.S.C. § 78u-4(b)(1)). We have examined these four statements in context, and we find support for a reasonable belief that the first three were false or misleading when made. Grossman, 120 F.3d at 1121.

We focus our attention on two internal reports plaintiff cites to demonstrate that defendants' claims were false. First, plaintiff points to an internal Level 3 report documenting that by December 2006: (1) "Level 3 had spent less than half of the capital, that is, $12.8 million out of the $30.2 million, devoted to completing critical transport interconnects and route integration"; (2) "Level 3 determined that $30.2 million was insufficient capital to complete transport interconnect and route integration work because the scope of those projects had been underestimated during the WilTel due diligence"; and (3) "Level 3 was . . . projecting that transport interconnect and route integration work would continue for WilTel into 2008."[9] JA, Vol. 1 at A59. Second, plaintiff relies on a report apparently written in early April 2007, which showed that defendants had completed less than one-fifth of WilTel route integration. Id. at A100.

We must determine whether plaintiff's allegations "support a reasonable belief that

---

[9] Plaintiff does not tell us when this report emerged, but as we read the complaint, it cannot have been sooner than mid-December 2006. See JA, Vol. 1 at A99 (discussing what the Network Integration 2007–2009 CAPEX Costs and Synergies Projections report showed "[a]s of December 2006"); id. at A59 (cross-referencing this report to show that "by mid-December 2006, the WilTel network integration was behind schedule and over budget").

19

the defendants['] statements identified by the plaintiff were false or misleading." Adams, 340 F.3d at 1099. Although we take these allegations "as a whole," id., it is initially necessary to parse the language plaintiff quotes fairly carefully to understand the relevant terminology. Accordingly, before we compare the reports with defendants' allegedly false representations, we review the relevant vocabulary.

*1. Terminology*

We note first that, as used in the complaint and the parties' briefs, "route integration" is a term that has several meanings. We explained earlier that the complaint describes "route integration" as the fifth and final phase of the overall network integration process. See JA, Vol. 1 at A84–85. But this final step, plaintiff explains, "actually had nothing to do with physical integration of routes—and was the last-touch process of decommissioning 'network redundancies.'" Aplt. Reply Br. at 13. Plaintiff emphasizes that his complaint also employs the term "route integration" in a different sense entirely, to refer to one part of the "physical integration" process. See id. at 12–13 ("[P]hysical integration included integration of routes."). "Physical integration" was the step that involved "building interconnects, completing route integration and building capacity—by far the most difficult, expensive and time consuming network integration task." Id. at 13.

As plaintiff generally uses the terms, then, "transport interconnect and route integration work" are two components of the "physical integration" process. Id. at 12–13. And "physical integration" is one component of the broad, overarching project of network integration. Id. With this terminology in mind, and, as always, taking plaintiff's

20

allegations to be true, we examine whether "a reasonable person would believe that the defendant's statements were misleading." Adams, 340 F.3d at 1099.

*2. The October and December Statements*

We turn first to plaintiff's allegation that, according to a mid-December 2006 report, Level 3 had spent less than half of the money it had allocated for "transport interconnects and route integration," and had determined that more capital would be necessary. Plaintiff alleges that "building interconnects, completing route integration and building capacity" constituted "by far the most difficult, expensive and time consuming network integration task." JA, Vol. 1 at A30. If Level 3 had spent less than half the money budgeted for this task by December, we think it reasonable to assume that overall WilTel network integration was not more than half complete at that time.[10] Thus, a reasonable person would consider the December report inconsistent with defendants' claims to have completed a majority of integration by October 17, 2006; a majority of physical network interconnections by October 24, 2006; or "85%, 90%" of integration by December 4, 2006. See Roncini v. Larkin, 253 F.3d 423, 434 (9th Cir. 2001) (analyzing whether "[t]he circumstances [were] inconsistent with the statements so as to show that the statements must have been false or misleading when made"). Furthermore, we

_____

[10] As we discuss below in the context of scienter, however, this is not the only inference we could draw from the facts plaintiff alleges. See Pirraglia v. Novell, Inc., 339 F.3d 1182, 1188 (10th Cir. 2003) ("[P]otentially negative inferences . . . appl[y] only to the Reform Act's scienter provision, not to the requirement that plaintiffs specify each statement alleged to be misleading and the reasons why it is misleading.").

21

consider this state of affairs inconsistent with Level 3 having been both "ahead of plan" and "under budget" in October.

### 3. The February Statement

But the December report, of course, tells us nothing about spending or capital allocation after that month. For this reason, it does not necessarily conflict with defendants' statement in February that, at that point, the "majority of the physical network interconnections" were complete. JA, Vol. 1 at A46–47. Nor is the February statement shown to be false by the report of April 2007. The April report, plaintiff alleges, indicated that by that month the company "had integrated less than one-fifth of WilTel route into Level 3's network." Id. at A100. But according to our definitions above, "route integration" and "physical network interconnections" were two distinct components of "physical integration," and plaintiff nowhere alleges that progress necessarily proceeded at the same pace on both components. Thus, for all we know, Level 3 could have completed a "majority of physical network interconnections" in April despite having been done with less than twenty percent of route integration.[11]

Drawing all reasonable inferences in favor of plaintiff, as we must when considering the issue of falsity at the Rule 12(b)(6) stage, Pirraglia, 339 F.3d at 1188, we

_____

[11] Similarly, the April report does not show that any of defendants' earlier statements were false. Plaintiff never explains how much of "physical integration" is made up of "route integration" work, much less the percentage of overall network integration that "route integration" constitutes. In other words, the complaint never shows why physical integration or network integration could not be mostly complete simply because one of their components, route integration, was only one-fifth done.

22

think that the district court erred. Plaintiff alleges no direct contradictions between Level 3's internal reports and its officers' outwards statements. But Plaintiff does adequately allege—if only barely—that defendants made three statements of material fact, on October 17, 2006, October 24, 2006, and December 4, 2006, that a reasonable person would understand as inconsistent with the facts on the ground.

## C. Scienter

As we have noted, however, it is not enough for plaintiff to point out misleading statements of material fact. Under the heightened pleading standards of the PSLRA, plaintiff must state with particularity facts "giving rise to a strong inference" that the defendants acted with scienter, which we define as "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." Adams, 340 F.3d at 1105 (internal quotation marks omitted).[12]

---

[12] Plaintiff alleges "that defendants' false statements were made with at least extreme recklessness." Aplt. Br. at 4. We have defined recklessness, under Section 10(b), as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." City of Phila. v. Fleming Cos., 264 F.3d 1245, 1260 (10th Cir. 2001) (internal quotation marks omitted). Neither negligence nor even gross negligence will meet this "particularly high standard." Dronsejko v. Thornton, 632 F.3d 658, 668 (10th Cir. 2011). Rather, we require something "akin to conscious disregard." Id. (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681–82 (6th Cir. 2004).

The Supreme Court "ha[s] not decided whether recklessness suffices to fulfill the scienter requirement." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1324 (2011). But we have held that it may, see, e.g., Adams, 340 F.3d at 1105, and defendants do not challenge this holding here, see Aplee. Br. at 46.

An inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre." Tellabs, 551 U.S. at 324. But we will draw a "strong inference" of recklessness only if, based on plaintiff's allegations, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. The district court concluded no cogent inference of scienter could be drawn from the complaint, and we agree.

### 1. The District Court's Opinion

We begin our analysis by rejecting plaintiff's argument that the district court's decision must be reversed because it "entirely overlooked [sixteen] witnesses and scores of internal reports that support plaintiff's claim." Aplt. Br. at 56. As the court noted, its "'job [wa]s not to scrutinize each allegation in isolation but to assess all the allegations holistically.'" JA, Vol. 4 at A1214 (quoting Tellabs, 551 U.S. at 326). The district court properly posed the question mandated by the Supreme Court: "'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" Id. (quoting Tellabs, 551 U.S. at 326). "Here," the district court concluded, "the answer [wa]s 'no.'" Id. We see no reason to doubt that the court properly considered plaintiff's entire complaint. See Adams, 340 F.3d at 1092 ("In light of the district court's express statement that it considered the pleadings in their entirety, we have no reason to conclude otherwise."). While its analysis was conclusory, the district court was under no duty to catalog and individually discuss the reports and witnesses plaintiff described. See Frank v. Dana

24

Corp., 646 F.3d 954, 961 (6th Cir. 2011) ("[A]fter Tellabs, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

### 2. The October and December Statements

We too have assessed plaintiff's complaint holistically, though we limit our discussion here to the allegations most relevant to the issue of scienter. We have identified three statements made by two Level 3 officers that were potentially material and that plaintiff provides reason to believe were false: (1) O'Hara's October 17 claim that a majority of WilTel integration was completed under budget; (2) O'Hara's further assertion that a majority of "physical network interconnections" for WilTel had been finished by October 24; and (3) Patel's December 4 estimate that WilTel integration efforts were "85%, 90% done." Plaintiff argues that defendants knew, or were reckless in not knowing, that these statements were false when made. "The critical question, therefore, is how likely it is that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 709 (7th Cir. 2008).

Plaintiff alleges that defendants monitored the integration process through regular meetings and reports, and we will assume without deciding that plaintiff provides sufficient detail through his confidential witnesses to demonstrate that this was the case. We are further willing to assume that Patel and O'Hara received and read the reports

25

plaintiff cites.[13] Even so, we cannot draw a strong inference that defendants made the above statements with scienter.

The fundamental weakness in plaintiff's complaint is that he gives us a great volume of puzzle pieces that, despite our best efforts, we cannot fit together. Following the chain of inferences we laid out above, we could plausibly infer from low expenditure levels that the high progress estimates Patel and O'Hara gave were wrong. If our inferences are correct, the conflict between internal reports and public statements would be evidence of scienter. See Frank, 646 F.3d at 959 n.2 (noting that "divergence between internal reports and external statements on the same subject" and "disregard of the most current factual information before making statements" can be factors supporting scienter).

But in the context of scienter, we must consider plausible competing inferences as

[13] The parties dispute whether allegations that internal reports contradicted defendants' statements could support scienter if plaintiff cannot show that defendants actually read the reports. Plaintiff argues that "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 665 (8th Cir. 2001) (emphasis added). Defendants, on the other hand, have emphasized that under our precedent it is insufficient to allege that a corporate officer "must have known a statement was false or misleading" merely based on the officer's position. Fleming, 264 F.3d at 1264 (internal quotation marks omitted); see id. ("Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company." (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999)) (internal quotation marks omitted)); see also Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."). Because we do not think a strong inference of scienter arises even if defendants did read the reports at issue, we need not decide this question.

26

well, Tellabs, 551 U.S. at 323, such as the possibility that the pace of Level 3's spending would not necessarily track the rate of actual integration progress. Furthermore, the language defendants used does not track the terminology in the internal reports plaintiff cites, which requires us to stack inference upon inference to even conclude that the statements were false—much less that defendants knew or were reckless in not knowing they were false. See supra Part II.B.2-3 (comparing defendants' estimates of progress on "WilTel integration," "physical network interconnections," and "those [WilTel integration] efforts" with internal reports documenting spending on WilTel "transport interconnects and route integration" and progress "integrat[ing] . . . WilTel route"). Indeed, as we explained above, some of the critical terms at issue are open to multiple interpretations. See supra Part II.B.1 (noting that plaintiff uses the term "route integration" in two entirely different senses). "Such 'omissions and ambiguities count against inferring scienter.'" Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010) (quoting Tellabs, 551 U.S. at 326).

In short, the fact that a close reading of some of defendants' progress estimates suggests that they may have been inconsistent with a few internal reports does not lead us to a strong inference that defendants' statements were intentionally fraudulent or extremely reckless. Given the difficulty we have, even with the benefit of hindsight, in determining whether a conflict actually existed between the reports and defendants' statements, the strongest inference we can draw is that defendants were negligent in failing to put together the pieces. See Ind. Elec. Workers' Pension Trust Fund IBEW v.

27

Shaw Grp., Inc., 537 F.3d 527, 540 (5th Cir. 2008) (concluding that corporate officers'
receipt of internal reports did not demonstrate scienter because the reports did not
necessarily "include[] information at odds with [the corporation]'s public statements").

### 3. Motive Allegations

Plaintiff argues that the circumstantial evidence of scienter we have just discussed
is bolstered by the fact that defendants had strong motives to engage in reckless or
deliberate fraud. Specifically, plaintiff alleges that defendants were motivated to mislead
investors regarding the integration progress: (1) to allow Level 3 to "complete the
Broadwing acquisition on more favorable terms, i.e., using less stock than it would have
had the truth about the integration status been known to investors," JA, Vol. 1 at A138;
(2) to enable Level 3 to refinance existing debt at more favorable interest rates, id.; (3) to
enhance certain defendants' compensation, which allegedly hinged on the successful
integration of WilTel, id. at A139–40; and (4) to permit certain defendants to sell their
Level 3 shares at inflated prices, id. at A142–45. "[M]otive can be a relevant
consideration" in making the scienter determination, and "personal financial gain may
weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 325. Nonetheless,
the asserted motives, taken with plaintiff's other allegations, fail to contribute to any
inference of scienter.

We look first at the Broadwing acquisition. Level 3 announced a definitive deal to
purchase Broadwing in October 2006 and then acquired the company using a combination
of cash and stock on January 3, 2007. JA, Vol. 1 at A138–39. Yet plaintiff alleges that

28

defendants continued to make false or misleading statements regarding integration progress long after the acquisition. In February, for instance, O'Hara reiterated that "[m]ost of the physical integration of WilTel is now complete." Id. at A62–63. In late July, he said Level 3 had "made significant progress on the integration of all acquisitions." Id. at A72. And, most strikingly, in the October 23, 2007, statements that plaintiff alleges revealed defendants' fraud, O'Hara was still insistent that "the physical network integration, the real estate integration, all of the people side of things are all progressing well." Id. at A81. As the Broadwing acquisition preceded these statements, that event did not motivate them.

Plaintiff notes the existence of a motive to refinance Level 3's debt. But general motives for management to further the interests of the corporation fail to raise an inference of scienter. "Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud." Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 278–79 (3d Cir. 2009). Defendants' refinancing of Level 3's existing debt at more favorable interest rates most plausibly reflected nothing more than a general desire to further the corporation's interests. See id. at 279.

Nor does plaintiff's assertion that defendants' compensation hinged on the performance of Level 3's stock price and the successful integration of WilTel lead us to infer scienter. First, plaintiff alleges that defendants received cash bonuses for the successful integration of WilTel and other acquired businesses. JA, Vol. 1 at A140. But

29

it appears that bonuses were awarded based on <u>actual</u> integration progress, not merely defendants' representations that the integration was successful. <u>Id.</u>, Vol. 3 at A807 (listing as one bonus calculation factor "[e]ffectiv[e] manage[ment] [of] WilTel acquisition integration activities . . . measured by an assessment of progress against integration project milestones and objectives"). Second, plaintiff states that defendants received stock options and restricted stock as compensation based on the performance of Level 3's stock. <u>See id.</u>, Vol. 1 at A141–42. This type of incentive-based compensation, however, is common among executives at publicly traded companies and does not ordinarily indicate scienter. <u>Cf. Green Tree</u>, 270 F.3d at 661 (defendant, who was the "highest paid business executive in the entire United States" in 1995 and 1996, had "a legally significant motive because the amount of his compensation was based on a percentage of Green Tree's pre-tax earnings, and his contract was set to expire at the end of 1996, making it urgent for [him] to maximize Green Tree's earnings for that year").

Finally, plaintiff's allegations concerning defendants' stock sales do not point to scienter. Plaintiff alleges that certain defendants engaged in sales of their personal holdings of Level 3 stock and that these defendants had not traded any Level 3 shares in the prior two years. The defendants engaging in these sales, however, retained a substantial percentage of their Level 3 holdings. Aplee. Br. at 56; <u>see also</u> JA, Vol. 1 at A188. Further, the sales were made pursuant to "automatic transactions" set up prior to the class period to pay withholding taxes that became due. Aplee. Br. at 56; <u>see also</u> JA, Vol. 1 at A187–88. These considerations rebut any inference of scienter we might

30

otherwise draw regarding these sales.  See Elam v. Neidorff, 544 F.3d 921, 928 (8th Cir. 2008) (stock sales pursuant to automatic trading plans that represent only a small portion of each seller's holdings do not suggest scienter).  In sum, plaintiff produces no convincing allegations of a motive for defendants to engage in fraud.  "The absence of a motive allegation . . . is not dispositive," Tellabs, 551 U.S. at 325, but it is "relevant," id., and in this case it counts against scienter, see Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1069 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

### 4. Disclosures After the Class Period

Plaintiff also alleges that defendants' disclosures after the class period revealed their knowledge of integration issues during the class period.  See JA, Vol. 1 at A103–07.  But the disclosures do not suggest that defendants knew or recklessly disregarded information contrary to their public statements.  For instance, in a conference call on February 7, 2008, O'Hara explained:

> Our service challenges in 2007 arose from the rapid integration of the companies we acquired, and the complications associated with simultaneously trying to operate the disparate processes and systems of the acquired companies, while developing the long-term operating environment. The service challenges fell into two broad areas—service quality and management, that is how well do our network and services perform from a quality standpoint once service has been initiated for our customer; and service delivery, the process of taking a customer order and then activating the service. Our service quality and management deteriorated through the first half of 2007, but as a result of

31

> numerous organizational process and systems changes, we have generally returned to the quality levels that we enjoyed prior to beginning the integrations, and our performance metrics are generally equal to or better than the levels that our customers were experiencing at the beginning of 2007. An exception to this statement is certain enterprise customers on legacy networks that have not yet been fully migrated to the Level 3 network.

Id. at A105. While this disclosure addresses the issues Level 3 experienced during the class period, it does not constitute an admission that defendants spoke fraudulently during that time. Rather, it reflects defendants' hindsight review of the integration process. This contributes nothing to an inference of scienter. Fleming, 264 F.3d at 1260.

Ultimately, the facts plaintiff alleges may constitute "a brushstroke" or two, In re Cabletron Sys., Inc., 311 F.3d 11, 40 (1st Cir. 2002), but they fail to paint a "portrait [that] satisfies the requirement for a strong inference of scienter under the PSLRA," id. Because plaintiff's complaint does not allege "a primary violation of the securities laws," his Section 20(a) claim also fails. See Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998).

## III.

The district court's order dismissing plaintiff's complaint with prejudice is AFFIRMED.