2022 CO 54 Jagged Peak Energy Inc.; Joseph N. Jaggers; Robert W. Howard; Shonn D. Stahlecker; Charles D. Davison; S. Wil Vanloh, Jr.; Blake A. Webster; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; J.P. Morgan Securities LLC; Goldman, Sachs & Co.; RBC Capital Markets, LLC; Wells Fargo Securities, LLC; UBS Securities LLC; Keybanc Capital Markets, Inc.; ABN AMRO Securities (USA) LLC; Fifth Third Securities, Inc.; Petrie Partners Securities, LLC; Tudor, Pickering, Holt & Co. Securities, Inc.; BMO Capital Markets Corp.; Deutsche Bank Securities Inc.; Evercore Group L.L.C.; and Scotia Capital (USA) Inc., Petitioners v. Oklahoma Police Pension and Retirement System, individually and on behalf of all others similarly situated, Respondent No. 21SC334
Supreme Court of Colorado, En banc
November 21, 2022

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 19CA1718

 Attorneys for Petitioners Jagged Peak Energy Inc.; Joseph N.
 Jaggers; Robert W. Howard; Shonn D. Stahlecker; Charles D.
 Davison; S. Wil Vanloh, Jr.; and Blake A. Webster:

 Shoemaker Ghiselli + Schwartz LLC

 Paul
 H. Schwartz

 Andrew
 R. Shoemaker

 Vinson
 & Elkins LLP

 Andrew
 E. Jackson

 Attorneys for Petitioners Citigroup Global Markets Inc.;
 Credit Suisse Securities (USA) LLC; J.P. Morgan Securities
 LLC; Goldman, Sachs & Co.; RBC Capital Markets, LLC;
 Wells Fargo Securities, LLC; UBS Securities LLC; Keybanc
 Capital Markets, Inc.; ABN AMRO Securities (USA) LLC; Fifth
 Third Securities, Inc.; Petrie Partners Securities, LLC;
 Tudor, Pickering, Holt & Co. Securities, Inc.; BMO
 Capital Markets Corp.; Deutsche Bank Securities Inc.;
 Evercore Group L.L.C.; and Scotia Capital (USA) Inc.:

 Holland & Hart LLP

 Holly
 Stein Sollod

 Paul,
 Weiss, Rifkind, Wharton & Garrison LLP

 Audra
 J. Soloway

 Attorneys for Respondent:

 Shuman, Glenn & Stecker

 Rusty
 E. Glenn

 Shuman, Glenn & Stecker

 Kip B.
 Shuman

 Scott+Scott Attorneys at Law LLP

 Thomas
 L. Laughlin, IV

 Donald
 A. Broggi

 Goldstein & Russell, P.C.

 Thomas
 C. Goldstein

 Attorneys for Amicus Curiae Securities Industry and
 Financial Markets Association:

 Hogan
 Lovells U.S. LLP

 Jessica Black Livingston

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 JUSTICE HOOD, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE
 BERKENKOTTER joined. JUSTICE MÁRQUEZ, joined by CHIEF
 JUSTICE BOATRIGHT, dissented.

 OPINION

 GABRIEL, JUSTICE

 ¶1
 In this case, we consider whether a division of the court of
 appeals misapplied federal case law when it concluded that
 respondent Oklahoma Police Pension and Retirement System
 ("Oklahoma") stated a plausible claim for relief
 under sections 11, 12(a)(2), and 15 of the Securities Act of
 1933 ("Securities Act"), 15 U.S.C. §§
 77k, 77l(a)(2), 77o, notwithstanding
 petitioners' assertions that the alleged
 misrepresentations at issue constituted immaterial
 "puffery" and amounted to claims based on
 hindsight, which are not actionable under federal
 law.[1]
We conclude that the division's conclusion was consistent
 with applicable federal precedent, and we therefore affirm
 the division's judgment.

 I.
Facts and Procedural History

 ¶2
 Because this case comes to us in the context of a C.R.C.P.
 12(b)(5) motion to dismiss, we take the facts primarily from
 the allegations in Oklahoma's amended complaint.

 ¶3
 Jagged Peak Energy Inc. ("Jagged") is a
 Denver-based company that specializes in the exploration,
 development, and production of crude oil and natural gas.
Jagged's development drilling plan is composed
 exclusively of horizontal, as opposed to vertical, drilling.
Although a horizontal well can cost up to 300% more to drill
 and complete for production than a vertical well directed to
 the same target horizon, the additional cost is expected to
 be recovered from increased production.

 ¶4
 Creating horizontal wells is a complicated process. Thus, oil
 and gas exploration and production companies like Jagged
 typically contract with third-party drilling companies to
 drill and service wells for them. These contract drilling
 service companies are generally compensated based on the
 amount of time that they work for the exploration and
 production companies and the costs that they incur during the
 engagement.

 ¶5
 In January 2017, Jagged conducted an initial public offering
 ("IPO"), during which it sold over 31 million
 shares at a price to the public of $15.00 per share. In
 connection with this IPO, Jagged filed a registration
 statement and incorporated offering materials (collectively,
 the "offering documents") with the Securities and
 Exchange Commission ("SEC"). The Jagged officers
 and directors named individually as defendants in this case
(the "individual defendants") each either signed or
 authorized the signing of the offering documents. Further, a
 number of

 investment banking houses that specialize in underwriting
 public offerings of securities (the "underwriter
 defendants") underwrote, served as financial advisors
 for, and assisted in the preparation and dissemination of
 Jagged's offering documents.

 ¶6
 Oklahoma, a governmental pension system that provides pension
 and disability benefits for municipal police officers in the
 state of Oklahoma, purchased Jagged shares "pursuant to
 and/or traceable to the [IPO]." According to Oklahoma,
 within a short time after its investment, facts came to light
 indicating that Jagged, the individual defendants, and the
 underwriter defendants (collectively, "defendants")
 had negligently overstated Jagged's ability to increase
 its oil and gas production. As a result, the price of Jagged
 shares saw several notable declines, and except for a brief
 surge, Jagged's stock has traded well below its IPO
 price.

 ¶7
 In light of the foregoing, Oklahoma filed a class action
 lawsuit in Denver District Court, alleging that defendants
 had made materially untrue statements and omissions in their
 offering documents in violation of sections 11, 12(a)(2), and
15 of the Securities Act. After the removal of this case to
 federal court and the case's subsequent remand back to
 the state district court, Oklahoma filed an amended complaint
 that added more than forty paragraphs of details to support
 its claim that Jagged had "negligently overstated [its]
 ability to increase its oil and

 gas production" by representing that it (1) "owned
 prime territory in the core oil producing window" of the
 area to be developed and (2) "had a highly experienced
 professional workforce capable of developing Jagged's
 property in an efficient and aggressive manner."

 ¶8
 Although the amended complaint identifies as materially
 misleading multiple statements, sometimes paragraphs at a
 time, from Jagged's offering documents, the issues before
 us require us to take a closer look at just two.

 ¶9
 The first statement, which the parties now refer to as
 "Statement 4," provided that Jagged's primary
 business objective was to "increase stockholder value
 through the execution of the following strateg[y]":

Maximize returns by optimizing drilling and completion
 techniques through the experience and expertise of our
 management and technical teams. Our experienced
 management and technical teams have a proven track record of
 optimizing drilling and completion techniques to drive well
 and field-level returns. We have experienced a significant
 decrease in our drilling and completion costs since 2014.

 ¶10
 The second statement, which the parties now refer to as
 "Statement 2," provided that Jagged's
 "development drilling plan is comprised exclusively of
 horizontal drilling with an ongoing focus on reducing
 drilling times, optimizing completions and reducing
 costs."

 ¶11
 Oklahoma alleged that both of these statements were
 materially untrue and misleading and omitted material
 information because Jagged had failed to disclose that (1) it
 had "hired inexperienced and wasteful employees and
 contractors to

 oversee and operate its drilling operations" in the
 development area at issue; (2) "the contractors had
 favorable provisions in their contracts with Jagged that gave
 them more money for increased costs"; and (3) as a
 result of such inefficient and unfavorable contract terms,
 Jagged had "incurred substantial and ongoing additional
 drilling and production costs." Oklahoma further alleged
 that Jagged violated Item 303 of Regulation S-K, 17 C.F.R.
 § 229.303(b)(2)(ii) (2021) (requiring, among other
 things, a securities registrant to "[d]escribe any known
 trends or uncertainties that have had or that are reasonably
 likely to have a material favorable or unfavorable impact on
 net sales or revenues or income from continuing
 operations"), by failing to disclose "uncertainties
 about the quality of its workforce, the Company's
 practice of hiring inexperienced and wasteful contractors and
 employees, and how those employee inadequacies were
 reasonably likely to (and did) adversely impact Jagged's
 operating results."

 ¶12
 Oklahoma contended that interviews with employees of Jagged
 and its contractors who worked for those entities
 "during the relevant period," as well as public
 records, provided further corroboration that the offering
 documents were false and misleading. Specifically, according
 to Oklahoma, the former employees who were interviewed
 observed that (1) Jagged's "two in-house geologists
 were inexperienced and incompetent," with one being
 deemed "not qualified" by a Jagged executive
 "due to his lack of relevant experience and this being
 his first job

 out of college"; (2) Jagged's CEO was aware of
 myriad problems and mistakes at the drilling sites; (3)
 Jagged was heavily dependent on a de facto "chief
 drilling contractor" who used his position "to
 award [contracts to] contractors he controlled,"
 notwithstanding that their bids were "consistently
 lower" than all other bids; (4) the "chief drilling
 contractor" then overbilled Jagged; (5) another Jagged
 executive "continuously steered drilling and operational
 work" to AEP, a contractor that was run by a
 long-standing business associate of his, Jagged gave AEP
 "a contract heavily skewed in [its] favor," and AEP
 then "deliberately ran up costs at Jagged"; and (6)
"in the immediate wake of the IPO," AEP more than
 doubled its daily field invoices "without any apparent
 basis," other than perhaps its understanding from Jagged
 that "it had the greenlight to be more profligate,"
 given that Jagged was using "investors' money."

 ¶13
 Jagged moved to dismiss the amended complaint under C.R.C.P.
 12(b)(5). In its motion, Jagged argued, as pertinent here,
 that Oklahoma did not sufficiently plead that the offering
 documents contained materially false misstatements or
 omissions, as required to state a claim under sections 11,
12(a)(2), and 15 of the Securities Act. Oklahoma responded
 that the above-noted portions of the offering documents
 provided sufficient grounds for relief, but the district
 court subsequently granted Jagged's motion to dismiss in
 part, concluding that although

 Oklahoma had failed to state a claim under section 11, its
 remaining allegations stated viable claims for relief under
 sections 12(a)(2) and 15.

 ¶14
 Jagged then filed a motion for "clarification" of
 the court's order, requesting that the district court
"clarify" its order by ruling that its dismissal of
 Oklahoma's section 11 claim was dispositive of
 Oklahoma's remaining claims, thus requiring dismissal of
 the amended complaint in its entirety. The district court
 agreed and issued a supplemental order dismissing with
 prejudice all of Oklahoma's claims. In so ruling, the
 court found and concluded that "[s]ection 12(a)(2) and
 15 are dependent on the findings of [s]ection 11."

 ¶15
 Oklahoma appealed, and in its opening brief, it changed
 course somewhat. Rather than continuing to rely on the full
 excerpted statements from Jagged's offering documents, it
 narrowed its focus to two general categories of alleged
 misrepresentations and omissions, only one of which is at
 issue before us, namely, the alleged material
 misrepresentations regarding the competence and expertise of
 Jagged's management and workforce. Within this category,
 Oklahoma centered its argument on (1) the heading from
 Jagged's plan to "[m]aximize returns by optimizing
 drilling and completion techniques through the experience and
 expertise of our management and technical teams" and (2)
 the standalone statement regarding Jagged's "ongoing
 focus on reducing drilling times, optimizing completions and
 reducing costs."

 ¶16
 Jagged responded by reiterating its view that none of the
 statements on which Oklahoma was relying were actionable. In
 particular, as pertinent here, Jagged contended that the
 statements at issue amounted to (1) vague statements of
 corporate optimism that are immaterial as a matter of law
 under the so-called "puffery" doctrine and (2)
 assertions regarding post-IPO events that did not support
 plausible claims for relief (because Oklahoma was required to
 allege that Jagged's representations or omissions were
 misleading at the time of the IPO).

 ¶17
 In a unanimous, unpublished opinion, a division of the court
 of appeals reversed the district court's judgment in
 part, concluding that as to both Statements 4 and 2, Oklahoma
 had pleaded actionable claims under sections 11, 12(a)(2),
 and 15 of the Securities Act (the division affirmed the
 district court's judgment in other respects that are not
 before us). Okla. Police Pension & Ret. Sys. v.
 Jagged Peak Energy Inc., No. 19CA1718, ¶¶ 81,
 88, 95 (Apr. 1, 2021).

 ¶18
 With respect to Statement 4, the division concluded that
 Oklahoma had plausibly pleaded that the statement was
 materially misleading or omitted material information
 because, at the time Jagged made the representation regarding
 its plan to maximize returns through the experience and
 expertise of its management and technical teams, its
 "management knew, but did not disclose, that
 Jagged's technical team was incompetent or unqualified
 and Jagged had

 awarded contracts that enriched its chief drilling contractor
 or were otherwise disadvantageous to Jagged."
Id. at ¶ 77.

 ¶19
 In so concluding, the division rejected Jagged's argument
 that Statement 4 comprised only immaterial puffery.
Id. at ¶ 78. On this point, the division
 acknowledged that Jagged had represented generally that it
 had a proven track record of optimizing drilling and
 completion techniques, but Jagged also represented, in
 support of its more general point, that it had experienced a
 significant decrease in its drilling and completion costs
 from 2014 through November 2016, citing "very specific
 numerical data" showing this decline in costs.
Id. Oklahoma alleged, however, that at the time of
 the IPO, Jagged had known workforce inadequacies that caused
 "substantial and ongoing additional drilling and
 production costs." Id. The division thus
 concluded that Jagged's representations were not mere
 "puffery" but rather had "specific
 meaning" when read in context. Id.

 ¶20
 The division reached a similar conclusion with respect to
 Statement 2 (regarding Jagged's representation as to its
 "ongoing focus"). Id. at ¶¶
 86-‍87. Specifically, the division concluded that this
 representation was contrary to the alleged facts "that,
 at the time of the IPO, Jagged was not focused on reducing
 its drilling times or its costs" but rather was
 "knowingly allowing inexperienced or incompetent
 employees to target well locations" and "had
 awarded costly

 contracts to its contractors that motivated them to extend
 drilling times, and those contracts were allegedly awarded to
 benefit individual managers, not to save money and
 time." Id. at ¶ 87. The division thus
 concluded that, for the same reasons that Oklahoma had
 plausibly pleaded viable claims as to Statement 4, it had
 plausibly pleaded viable claims as to Statement 2.
Id. at ¶ 88.

 ¶21
 Finally, the division observed that because Oklahoma had
 alleged that Jagged's "managerial mistakes had
 already resulted in cost overruns and had decreased
 production at the time of the [IPO]," which the division
 deemed "an uncertainty that was likely to materially
 impact revenues," Item 303 obligated Jagged to disclose
 the existing problems with its workforce. Id. at
 ¶ 93. The division thus reversed the district
 court's judgment to the extent that it had dismissed the
 portion of Oklahoma's Item 303 claim that was based on
 Jagged's failure to disclose the above-referenced
 uncertainties. Id. at ¶ 94.

 ¶22
 Jagged then petitioned this court for certiorari review, and
 we granted its petition.

 II.
Analysis

 ¶23
We begin by setting forth the applicable standard of review.
Next, we discuss the legal framework governing claims brought
 under sections 11, 12(a)(2), and 15 of the Securities Act. We
 then consider Jagged's contentions that

 Oklahoma's claims are based on non-actionable puffery
 statements pleaded with the benefit of hindsight.

 A.
Standard of Review

 ¶24
We review de novo a district court's dismissal of a
 complaint for failure to state a claim under C.R.C.P.
 12(b)(5). N.M. by and through Lopez v. Trujillo,
 2017 CO 79, ¶ 18, 397 P.3d 370, 373. Applying the same
 standard as the district court, we accept all factual
 allegations in the complaint as true and view them in the
 light most favorable to the non-moving party. Id.
"Dismissal under C.R.C.P. 12(b)(5) is proper only when
 the facts alleged in the complaint cannot, as a matter of
 law, support the claim for relief." Id.

 ¶25
 Under the "plausibility" standard for assessing
 C.R.C.P. 12(b)(5) motions that we adopted in Warne v.
 Hall, 2016 CO 50, ¶¶ 9, 24, 373 P.3d 588, 591,
 595, to survive a motion to dismiss for failure to state a
 claim on which relief can be granted, a plaintiff must allege
 sufficient facts that, if taken as true, show plausible
 grounds to support a claim for relief.

 B.
The Securities Act

 ¶26
Sections 11, 12(a)(2), and 15 of the Securities Act impose
 liability on certain participants in a registered securities
 offering when "the publicly filed documents used during
 the offering contain material misstatements or
 omissions." In re Morgan Stanley Info. Fund Sec.
 Litig., 592 F.3d 347, 358 (2d Cir. 2010).

 ¶27
 Specifically, section 11 prohibits materially misleading
 statements or omissions in registration statements filed with
 the SEC. See 15 U.S.C. § 77k(a). To state a
 claim under section 11, plaintiffs must plausibly allege that
 (1) they purchased a registered security from the issuer or
 in the aftermarket following the IPO; (2) the defendant
 participated in the offering in such a way as to give rise to
 liability under the statute; and (3) the registration
 statement "contained an untrue statement of a material
 fact or omitted to state a material fact required to be
 stated therein or necessary to make the statements therein
 not misleading." Morgan Stanley, 592
 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)).

 ¶28
Section 12(a)(2) provides for liability when a prospectus or
 oral communication, rather than a registration statement,
 contains a material misstatement or omission. See 15
 U.S.C. § 77l(a)(2). The Supreme Court, however,
 has interpreted section 12 as imposing liability only on
 "statutory sellers," which are defined as
 individuals who (1) "passed title, or other interest in
 the security, to the buyer for value" or (2)
"successfully solicit[ed] the purchase [of a security],
 motivated at least in part by a desire to serve [their] own
 financial interests or those of the securities owner."
Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988). Thus,
 to state a viable claim for relief under section 12(a)(2), a
 plaintiff must plausibly allege that:

(1) the defendant is a "statutory seller"; (2) the
 sale was effectuated "by means of a prospectus or oral
 communication"; and (3) the prospectus or oral
 communication "include[d] an untrue statement of a
 material fact or omit[ted] to state a material fact necessary
 in order

 to make the statements, in the light of the circumstances
 under which they were made, not misleading."

Morgan Stanley, 592 F.3d at 359 (alterations in
 original) (quoting 15 U.S.C. § 77l(a)(2)).

 ¶29
Section 15 extends liability, jointly and severally, to any
 person who, "by or through stock ownership, agency, or
 otherwise, or who, pursuant to or in connection with an
 agreement or understanding with one or more other persons by
 or through stock ownership, agency, or otherwise, controls
 any person" who is liable under sections 11 and 12,
 "unless the controlling person had no knowledge of or
 reasonable ground to believe in the existence of the facts by
 reason of which the liability of the controlled person is
 alleged to exist." 15 U.S.C. § 77o(a).
Therefore, if a court dismisses a plaintiff's claims
 under both sections 11 and 12(a)(2), then it must likewise
 dismiss any derivative section 15 claims. See In re
 Alcatel Sec. Litig., 382 F.Supp.2d 513, 533 (S.D.N.Y.
2005).

 ¶30
 Finally, according to an SEC interpretive release regarding
 Item 303 of SEC Regulation S-K, Item 303 establishes a duty
 of disclosure when a "trend, demand, commitment, event
 or uncertainty is both presently known to management and
 reasonably likely to have material effects on the
 registrant's financial condition or results of
 operation." In re Facebook, Inc., IPO Sec. &
 Derivative Litig., 986 F.Supp.2d 487, 506 (S.D.N.Y.
2013) (quoting Management's Discussion and Analysis of
 Financial Condition and Results of Operations; Certain
 Investment

 Company Disclosures, Securities Act Release No. 6835,
 Exchange Act Release No. 26,831, Investment Company Act
 Release No. 16,961, 43 SEC Docket 1330, 54 Fed.Reg. 22,427,
 22,429 (May 24, 1989)). And because sections 11 and 12(a)(2)
 of the Securities Act prohibit "omission[s] in
 contravention of an affirmative legal disclosure
 obligation[,]" Morgan Stanley, 592 F.3d at 360,
 a defendant may be liable under either provision if it
 violates Item 303's disclosure obligation, see
Facebook, 986 F.Supp.2d at 506-14 (denying the
 defendants' motion to dismiss the plaintiffs' claims
 under sections 11 and 12(a)(2), and, in turn, section 15, of
 the Securities Act, after concluding, among other things,
 that the plaintiffs had sufficiently pleaded that the
 defendants had omitted material information in violation of
 Item 303).

 C.
Claims at Issue

 ¶31
 Turning then to the case before us, we note that Jagged
 contends that the division below erroneously concluded that
 Statements 4 and 2 stated plausible claims for relief
 because, in Jagged's view, (1) those statements amounted
 to no more than immaterial puffery and were not rendered
 material by the presence of nearby allegations of historical
 or measurable information; and (2) in concluding that
 Oklahoma had plausibly pleaded claims that Statements 4 and 2
 were misleading when made, the division inappropriately
 relied on Oklahoma's

 allegations regarding post-IPO events, which, as a matter of
 law, could not support Oklahoma's claims here.

 ¶32
We address and reject each contention in turn.

 1.
Puffery

 ¶33
 Jagged first argues that the division adopted a theory of
 "couching" generally rejected by federal courts
 when the division concluded that the allegedly immaterial
 puffery statements that Oklahoma had identified as misleading
 were "transformed into material and therefore actionable
 statements simply by the presence in the offering materials
 of other, nearby, truthful, historical information."
Jagged asserts that the division got it doubly wrong because,
 in Jagged's view, Oklahoma had not raised the argument on
 which the division relied, nor did Oklahoma identify the
 contextual statements on which the division ultimately rested
 its conclusion (this is the second issue on which we granted
 certiorari). We are unpersuaded.

 ¶34
 As an initial matter, Jagged misapprehends the division's
 analysis. The division did not rely on a theory of couching,
 nor did it rule on a basis not properly before it. Jagged
 principally argued that Oklahoma's assertions constituted
 immaterial puffery as a matter of law. Responding directly to
 this argument, the division concluded that Statements 4 and 2
 were not overly vague statements of corporate optimism that
 were incapable of objective verification. To the contrary,

 the division concluded that when read in context, the
 statements had "specific meaning," and Oklahoma had
 alleged that such statements were misleading when they were
 made. Okla. Police Pension, ¶¶ 75, 78.
Thus, the division observed that Oklahoma had alleged that
 Jagged's "historical claims were partially
 inaccurate, making the predictive claims that they support
 misleading by omission." Id. at ¶ 75.

 ¶35
 Accordingly, rather than looking to accurate historical
 statements "couched" around allegedly misleading
 (and therefore non-actionable) puffing statements, the
 division simply considered the allegedly misleading
 statements in context, which, under established precedent, it
 could properly do.

 ¶36
 Specifically, in reviewing a district court's dismissal
 of a complaint for failure to state a claim, appellate courts
 must examine the complaint to determine its facial
 plausibility, and in doing so, the courts may "consider
 any written instrument attached to the complaint, statements
 or documents incorporated into the complaint by reference,
 legally required public disclosure documents filed with
 the SEC, and documents possessed by or known to the
 plaintiff and upon which it relied in bringing the
 suit." ATSI Commc'ns, Inc. v. Shaar Fund,
 Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (emphasis added).

 ¶37
 Accordingly, in determining whether Oklahoma plausibly
 pleaded the element of materiality, the division did not err
 in considering all of the allegations

 in Oklahoma's amended complaint, which
 identified the "partially misleading" historical
 statements on which the division relied, documents
 incorporated by reference in the amended complaint, and
 representations made in the offering documents filed with the
 SEC (including any tables, graphs, and statements set forth
 therein).

 ¶38
We thus turn to the merits of Jagged's contention that,
 as a matter of law, Statements 4 and 2 comprised immaterial,
 non-actionable puffery.

 ¶39
 In cases like the one before us, "two issues are central
 to claims under sections 11 and 12(a)(2): (1) the existence
 of either a misstatement or an unlawful omission; and (2)
 materiality." Morgan Stanley, 592 F.3d at 360.
Materiality for purposes of sections 11 and 12(a)(2), in
 turn, is defined as follows: "[W]hether the
 defendants' representations, taken together and in
 context, would have misled a reasonable investor."
Id. (alteration in original) (quoting Rombach v.
 Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).

 ¶40
 Materiality is an inherently fact-specific inquiry.
Facebook, 986 F.Supp.2d at 508. Thus, a complaint
 may not properly be dismissed on materiality grounds unless
 the alleged misstatements or omissions "are so obviously
 unimportant to a reasonable investor that reasonable minds
 could not differ on the question of their importance."
ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan
 Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting
Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d
 Cir. 2000)).

As a result, the materiality element "will rarely be
 dispositive in a motion to dismiss." Morgan
 Stanley, 592 F.3d at 360.

 ¶41
 Statements that are classified as "puffery" are
 "generalized statements of optimism that are not capable
 of objective verification." Grossman v. Novell,
 Inc., 120 F.3d 1112, 1119 (10th Cir. 1997). Such
 "[v]ague, optimistic statements are not actionable
 because reasonable investors do not rely on them in making
 investment decisions." Id. And because
 reasonable investors would not rely on such vague, broad, and
 non-specific statements, those statements are immaterial as a
 matter of law. See Barilli v. Sky Solar Holdings,
 Ltd., 389 F.Supp.3d 232, 250 (S.D.N.Y. 2019).

 ¶42
 Like all statements in the materiality analysis, puffery must
 be considered in context. See Casella v. Webb, 883
 F.2d 805, 808 (9th Cir. 1989). Context, however, can take
 many forms and, depending on the facts, may well impact the
 significance, if any, that a reasonable investor would place
 on the withheld or misrepresented information.

 ¶43
 For example, in City of Monroe Employees Retirement
 System v. Bridgestone Corp., 399 F.3d 651, 669-71 (6th
 Cir. 2005), the Sixth Circuit considered a tire
 manufacturer's and its subsidiary's public statements
 affirming the safety and quality of its tires, as well as
 allegedly false representations in the manufacturer's
 financial statements accompanying its annual reports. The
 court concluded that all but one of eight specifically
 challenged representations were "best

 characterized as loosely optimistic statements insufficiently
 specific for a reasonable investor to 'find them
 important to the total mix of information
 available.'" Id. at 671 (quoting In re
 Ford Motor Co. Sec. Litig., 381 F.3d 563, 571 (6th Cir.
2004)). As to the one statement that the court viewed
 differently (the subsidiary's statement that "the
 objective data" reinforced its belief that its tires
 were "high-quality, safe tires"), the court found
 this statement to be actionable, given the context in which
 it was made. Id. at 674. Specifically, the court
 observed that because consumers had filed multiple lawsuits
 against the subsidiary prior to the time that the subsidiary
 made the statement regarding the tires' safety, "[a]
 reasonable juror could infer that the 'objective
 data' representation was a direct response to the
 lawsuits, or to the public challenges to the safety of [the
 subsidiary's] tires, or to both." Id. at
 672. The court further disagreed that the representation at
 issue was merely a statement of general optimism or pure
 opinion because, in the court's view, "the statement
 was an assertion of a relationship between data and a
 conclusion," which a fact-finder "could test
 against record evidence." Id. at 674. And even
 if the statement could be classified as opinion, the court
 deemed it "specific enough to form the basis of an
 actionable securities fraud claim." Id.

 ¶44
 Industry-specific context may likewise impact the materiality
 of a given statement. For example, in

Bricklayers & Masons Local Union No. 5 Ohio Pension
 Fund v. Transocean Ltd., 866 F.Supp.2d 223, 243
(S.D.N.Y. 2012), the court considered whether an offshore oil
 contractor's representation that it had "conducted
 'extensive' training and safety programs" was,
 among other things, non-actionable puffery. The court
 concluded that the representation was actionable because the
 court could not say, as a matter of law, that the
 representation regarding the contractor's training
 efforts was so obviously unimportant to a reasonable investor
 that reasonable minds could not differ as to the importance
 of the representation. Id. at 244. In support of
 this conclusion, the court looked to the industry-specific
 context, stating, "In an industry as dangerous as
 deepwater drilling, it is to be expected that investors will
 be greatly concerned about an operator's safety and
 training efforts." Id.

 ¶45
 Lastly, a defendant's own, separate representations may
 be telling. See Casella, 883 F.2d at 808. Thus, a
 defendant's statements "'cannot be considered in
 isolation,' but must be viewed 'in the context of the
 total presentation.'" Id. (quoting
Hughes v. Dempsey-Tegeler & Co., 534 F.2d 156,
 176 (9th Cir. 1976)). "What might be innocuous
 'puffery' or mere statement of opinion standing alone
 may be actionable as an integral part of a representation of
 material fact when used to emphasize and induce reliance upon
 such a representation." Id.

 ¶46
 Even when considering the pertinent context in which
 statements were made, however, federal courts have concluded
 that "general positive statements"

 about, for example, a chief executive officer's
 "professional history and management abilities" and
 about a company's "proven track record" can
 still, in appropriate circumstances, amount to non-actionable
 puffery. Barilli, 389 F.Supp.3d at 252-53; see
 also In re Level 3 Commc'ns, Inc. Sec. Litig., 667
 F.3d 1331, 1340 (10th Cir. 2012) (concluding that a
 defendant's representations as to its "proven
 integration experience" and its intended
 "focus" in the upcoming year on integration were
 "vague (if not meaningless) management-speak upon which
 no reasonable investor would base a trading decision").

 ¶47
 In light of the foregoing precedent, Jagged argues that
 Statements 4 and 2 constituted immaterial puffery because
 Statement 4 "was a vague opinion about the company's
 perceived strengths" and Statement 2 was a "generic
 statement[] of corporate objectives." For several
 reasons, we disagree.

 ¶48
 First, regarding Statement 4, as the division below
 suggested, touting a strategy of maximizing returns "by
 optimizing drilling and completion techniques through the
 experience and expertise of [Jagged's] management and
 technical teams" and lauding a company's
 "proven track record" may, standing alone, be too
 general to support a viable claim. But that is not all that
 Oklahoma alleged. As noted above, Oklahoma also alleged that
 known historical and objectively verifiable facts and data
 could plausibly show that these general allegations were
 misleading at the time of the IPO and that defendants knew
 that they were,

 thereby undermining any claim of mere puffery. For example,
 Oklahoma alleged that contrary to Jagged's
 representations, former Jagged and contractor employees
 "during the relevant period" observed that (1)
 Jagged's in-house geologists were, in fact,
 inexperienced and incompetent, with one
 being deemed "not qualified" by a Jagged executive
 due to his lack of relevant experience; (2) incompetence at
 Jagged's drilling sites resulted in myriad problems and
 mistakes of which Jagged's CEO was himself aware; and (3)
 Jagged's "chief drilling contractor" and a
 Jagged executive steered contracts to companies that they
 controlled or that were controlled by business associates
 (sometimes based on bids that were lower than other bids that
 Jagged had received), and these companies then signed
 favorable contracts and proceeded to overbill Jagged,
 rendering the representations regarding Jagged's history
 of decreasing costs at best misleading (and verifiably so).
This is particularly true given Item 303's requirement
 that an SEC registrant disclose trends, demands, events, or
 uncertainties that are known to management and reasonably
 likely to have material effects on the registrant's
 financial condition or results of operation.
Facebook, 986 F.Supp.2d at 506. Thus, even if the
 historical information regarding Jagged's declining costs
 in the stated time period was accurate, the trend was
 allegedly in the opposite direction, and, if true, defendants
 had a duty to disclose that trend and its resulting
 uncertainty.

 ¶49
 Second, regarding Statement 2, in which Jagged represented
 that its development plan was "comprised exclusively of
 horizontal drilling with an ongoing focus on reducing
 drilling times, optimizing completions, and reducing
 costs," we again acknowledge that, standing alone, this
 statement might not be actionable. But when viewed in the
 context of the historical and objectively verifiable facts
 set forth above, we conclude that Oklahoma has pleaded
 sufficient facts to support plausible claims for relief.
Specifically, the facts set forth above in connection with
 our analysis of Statement 4, if true, can plausibly establish
 that Jagged, in fact, was not focused on optimizing
 completions and reducing costs. Indeed, the alleged facts,
 which are verifiable (and thus, by definition, not mere
 puffery), suggest the opposite.

 ¶50
 Third, as noted above, industry-specific context may likewise
 impact the materiality of a given statement. See
Bricklayers & Masons Local Union No. 5, 866
 F.Supp.2d at 243-44. Here, accepting the allegations in
 Oklahoma's amended complaint as true, in the oil and gas
 industry, a horizontal well can cost up to 300% more to drill
 and complete for production than a vertical well directed to
 the same target horizon, but the extra costs associated with
 this process are expected to be recovered through increased
 production from the well. Thus, just as an investor in an
 industry as dangerous as deepwater drilling would be expected
 to be concerned about an operator's safety and training
 efforts, id. at 244, an investor in

 a company like Jagged, which exclusively engaged in
 horizontal drilling and relied heavily on contract drilling
 services companies, would be expected to be concerned with
 the company's experience with horizontal drilling, its
 relationships with its contractors, and its ability to
 control costs.

 ¶51
 Fourth, were we to adopt Jagged's rigid position
 regarding the representations that it alleges to be puffery
 here, we fear that we would effectively create a form of
 "magic words" exception to the materiality element
 that is inconsistent with what, as noted above, is an
 inherently fact-specific analysis. See Facebook, 986
 F.Supp.2d at 508. Under Jagged's apparent interpretation,
 virtually any statement containing the words
 "experience," "expertise," "track
 record," or "focus" would be immaterial as a
 matter of law, regardless of anything else alleged in a
 complaint. Were we to embrace such a position, however,
 securities registrants could use words like these to hide
 behind, or between, their own misrepresentations. Thus, we
 agree with the observation of one federal district court that
 "a company's statements that it is
 'premier,' 'dominant,' or 'leading'
 must not be assessed in a vacuum (i.e., by plucking
 the statements out of their context to determine whether the
 words, taken per se, are sufficiently
 'vague' so as to constitute puffery)."
Scritchfield v. Paolo, 274 F.Supp.2d 163, 175-76
(D.R.I. 2003). Rather, such statements "are properly
 interpreted only by reference to the relevant circumstances
 that underlie their meaning." Id. at 176.

 ¶52
 For these reasons, on the specific facts presented here, we
 cannot say that the statements at issue were nothing more
 than generalized statements of corporate optimism that cannot
 be objectively verified. Nor, when we consider the context in
 which the statements were made, can we conclude that they
 would have been so obviously unimportant to a reasonable
 investor that reasonable minds could not differ on the
 question of their importance, thereby rendering them
 immaterial as a matter of law. See ECA, 553 F.3d at
 197; Grossman, 120 F.3d at 1119. Accordingly, we
 conclude that the division below properly rejected
 Jagged's contentions that Statements 4 and 2 were, as a
 matter of law, mere puffery.

 ¶53
 In so concluding, we are not persuaded by Jagged's
 assertion that the representations at issue were not capable
 of objective verification. During oral argument, Jagged
 contended that because no standard exists for determining
 when an unspecified amount of experience can constitute
 "having experience" or when a company's
 business activities become a "focus," its
 representations that it had (1) management and technical
 teams experienced in "optimizing drilling and completion
 techniques" and (2) "an ongoing focus on reducing
 drilling times, optimizing completions and reducing
 costs" are inherently unverifiable. In our view,
 however, "verifiable" is not necessarily synonymous
 with "quantifiable" or "measurable."
Thus, rather than examining just how much experience
 Jagged's

 management and technical teams had and how much of
 Jagged's business activity centered around reducing
 drilling times, we believe that the relevant question is
 whether a fact-finder could test Jagged's statements
 against the record evidence. See City of Monroe, 399
 F.3d at 674. Here, evidence that one of Jagged's two
 in-house geologists was right out of college (coupled with a
 Jagged executive's statement that this lack of experience
 rendered the geologist "not qualified") is one form
 of record evidence on which a fact-finder could reasonably
 rely to test Jagged's assertions regarding its experience
 and expertise. Incompetence on the job leading to
 inappropriate drilling site selection, collapsed wells, and
 dramatically increased costs, if proven, would likewise
 constitute objective evidence on which a fact-finder could
 rely to test Jagged's representations.

 ¶54
We likewise are unpersuaded by the case law on which Jagged
 relies because we view the statements at issue here as
 distinguishable from the kinds of statements that other
 courts have found to be too vague to be actionable. To be
 sure, courts have deemed to be non-actionable puffery bald
 representations touting a company's "[e]xperienced
 management team" with a "track record of executing
 effective strategies and achieving profitable growth,"
City of Omaha Police & Fire Ret. Sys. v. Evoqua Water
 Techs. Corp., 450 F.Supp.3d 379, 400 (S.D.N.Y. 2020),
 and statements extolling a company's "successful
 businessman" chief executive officer and the
 company's "proven track record . . . operating

 under local conditions," Barilli, 389 F.Supp.3d
 at 252. For the reasons set forth above, however, in this
 case, Oklahoma did not rely solely on bald statements of
 corporate optimism. Rather, it alleged sufficient objectively
 verifiable facts to allow a fact-finder to test Jagged's
 more general representations.

 ¶55
 Accordingly, we conclude that Oklahoma's allegations
 regarding Statements 4 and 2 were sufficient to survive
 Jagged's motion to dismiss on puffery grounds.

 2.
Hindsight Pleading

 ¶56
 Jagged next argues that the division committed reversible
 error when it allowed Oklahoma to base its claims on
 "hindsight pleading." Specifically, in Jagged's
 view, the division improperly relied on Oklahoma's
 allegations regarding post-IPO well collapses, cost
 increases, disadvantageous contracts, and employee departures
 to infer that Jagged had misrepresented or omitted
 information regarding its team's experience or its
 finances at the time of the IPO. Jagged asserts that the
 division was required to assess any alleged
 misrepresentations or omissions at the time the disclosures
 were made or should have been made. Although we view this
 issue as somewhat close, we ultimately are unpersuaded.

 ¶57
 As noted above, to plead a claim under sections 11, 12(a)(2),
 or 15 of the Securities Act, a plaintiff must allege that the
 purported misrepresentations or

 omissions were made at the time of the IPO. See 15
 U.S.C. § 77k(a) (providing for liability when "any
 part of the registration statement, when such part became
 effective, contained an untrue statement of a material
 fact or omitted to state a material fact required to be
 stated therein or necessary to make the statements therein
 not misleading") (emphasis added); 15 U.S.C. §
 77l(a)(2) (providing for liability when a person
 offers or sells a security by means of a prospectus or oral
 communication that includes an untrue statement of material
 fact or omits a material fact); 15 U.S.C. §
 77o(a) (providing for derivative liability of
 "controlling persons"). At a minimum then, a
 plaintiff must plead facts to demonstrate that the allegedly
 misrepresented or omitted facts existed and were either known
 or knowable at the time of the offering. See In re HEXO
 Corp. Sec. Litig., 524 F.Supp.3d 283, 300 (S.D.N.Y.
2021).

 ¶58
We recognize that Oklahoma's amended complaint includes
 many allegations recounting actions and events that occurred
 after the IPO, and we agree that these events cannot
 alone support an inference that trouble was brewing at Jagged
 prior to the IPO.

 ¶59
 But in addition to these claims, the amended complaint makes
 the factual allegation that "during the relevant
 period," former employees of Jagged and its contractors
 observed that (1) Jagged's two in-house geologists were
 inexperienced and incompetent; (2) one Jagged executive
 regarded one of the two geologists as

"not qualified" as a result of "his lack of
 relevant experience and this being his first job out of
 college"; (3) the collapsing of many wellbores was
 indicative of the geologists' incompetence in selecting
 well sites; (4) the well collapses, as well as Jagged's
 entering into disadvantageous contracts, led to
 "dramatically increased costs"; and (5)
 Jagged's CEO was aware of myriad problems and mistakes at
 the drilling sites. Similarly, the amended complaint alleges
 that "at the time of the Offering, [Jagged]
 failed to disclose that it did not have qualified workers in
 sufficient numbers to achieve its production and well
 completion goals" and further failed to disclose the
 various facts set forth above. (Emphasis added.)

 ¶60
 Although the amended complaint could (and perhaps should)
 have better clarified exactly when "the relevant
 period" was, when we read "the relevant
 period" together with "at the time of the
 Offering," we are satisfied that Oklahoma sufficiently
 alleged that Jagged's representations were misleading at
 the time of the IPO and not solely in hindsight. This is
 particularly true given that, at this stage of the
 proceedings, we must accept the amended complaint's
 well-pleaded allegations as true and view those allegations
 in the light most favorable to Oklahoma. See N.M.,
 ¶ 18, 397 P.3d at 373.

 ¶61
 Accordingly, we conclude that Oklahoma plausibly alleged
 facts indicating that Jagged's statements about its
 workforce experience and focus on decreasing

 costs, and its decision to omit information about
 disadvantageous contracts, were misleading at the time of the
 IPO.

 ¶62
 Finally, we note Jagged's contention that even if some of
 Oklahoma's allegations are not based on hindsight
 pleading, those that remain are still insufficient to state a
 claim under the standard for opinion statements established
 in Omnicare, Inc. v. Laborers District Council
 Construction Industry Pension Fund, 575 U.S. 175, 194
(2015) (concluding that an investor "must identify
 particular (and material) facts going to the basis for the
 issuer's opinion").

 ¶63
 Although the division below indicated that its conclusion
 "that Oklahoma has stated a plausible claim that Jagged
 misled investors" was "[p]ursuant to
 Omnicare," Okla. Police Pension,
 ¶ 77, Jagged did not cite to Omnicare in its
 certiorari petition, nor did it request that this court grant
 certiorari to consider the division's decision regarding
 opinion statements. Accordingly, that question is not
 properly before us, and we will not consider it. See
Colo. Permanente Med. Grp., P.C. v. Evans, 926 P.2d
 1218, 1228-29 (Colo. 1996).

 ¶64
 In concluding that Oklahoma has plausibly pleaded its claims
 on the specific facts before us, we emphasize the limited
 nature of our opinion today. This case comes before us in the
 context of a motion to dismiss for failure to state a claim.
Accordingly, the only question before us is whether Oklahoma
 plausibly alleged facts that, if proven, can support
 liability. In this context, we have assumed the

 truth of Oklahoma's well-pleaded factual allegations, and
 we have afforded Oklahoma the reasonable inferences to be
 drawn from those allegations, as we are required to do. We
 conclude only that the division correctly determined that it
 could not dismiss the claims at issue as a matter of law at
 this early stage of the proceedings. We, of course, express
 no opinion on the ultimate merits of the claims asserted in
 this case.

 III.
Conclusion

 ¶65
 For the foregoing reasons, we conclude that the division
 below properly (1)applied federal law in concluding that
 Oklahoma plausibly pleaded viable claims for relief under
 sections 11, 12(a)(2), and 15 of the Securities Act; and
 (2)rejected Jagged's assertions that, as a matter of law,
 the alleged misrepresentations at issue comprised immaterial
 puffery and amounted to improper hindsight pleading.

 ¶66
 Accordingly, we affirm the judgment of the division below.

 JUSTICE
 MÁRQUEZ, joined by CHIEF JUSTICE BOATRIGHT, dissented.

 JUSTICE MÁRQUEZ, joined by CHIEF JUSTICE BOATRIGHT,
 dissenting.

 ¶67
 The majority holds that Oklahoma Police Pension and
 Retirement System ("Oklahoma") has stated plausible
 claims for relief against Jagged Peak Energy Inc.
("Jagged") under sections 11, 12(a)(2), and 15 of
 the Securities Act of 1933, even though federal courts have
 consistently reached the opposite conclusion in cases raising
 similar allegations. Federal courts deem statements like
 Jagged's about its "proven track record" and
 "ongoing focus" to be non-actionable, immaterial
 puffery because no reasonable investor would base a trading
 decision on such "vague (if not meaningless)
 management-speak." In re Level 3 Commc'ns, Inc.
 Sec. Litig., 667 F.3d 1331, 1340 (10th Cir. 2012).

 ¶68
 The majority admits that the challenged statements, standing
 alone, are too general to be actionable. See Maj.
 op. ¶¶ 48-49. But the majority nevertheless affirms
 the division's conclusion that Statements 4 and 2 support
 a viable claim under the Securities Act by reading the
 statements in conjunction with Oklahoma's other
 allegations in the amended complaint. Although I agree with
 the majority that a court may look to context to decide
 whether an allegedly misleading statement is material for
 purposes of a claim under the Securities Act, I disagree that
 a court may lean on nearby historical statements and data to
 concretize an otherwise vague puffing statement, which is
 what the division did below, and which federal case law
 explicitly prohibits.

See Freeland v. Iridium World Commc'ns, Ltd.,
 545 F.Supp.2d 59, 76 (D.D.C. 2008) ("Combining puffery
 with accurate historical statements does not render the
 puffery material.") (quoting In re XM Satellite
 Radio Holdings Sec. Litig., 479 F.Supp.2d 165, 177
(D.D.C. 2007)). I further disagree that in determining
 whether a statement is material, a court may rely on
 other allegations in the complaint that the statement was
 misleading, which is what the majority has done
 here.

 ¶69
 Not only does the majority fail to disavow the approach taken
 by the division below, it also compounds the division's
 error by conflating the plaintiff's burden to show that
 the statement was material with the separate burden
 to show that the statement was misleading. In so doing, the
 majority departs from federal precedent.

 ¶70
 Statements about a company's "proven track
 record" and "ongoing focus" will not be
 puffery in every case. But in this case, a reasonable
 investor would not rely on such vague representations.
Because I disagree with the majority's analytical
 approach and because Statements 4 and 2 are immaterial
 puffery and therefore non-actionable, I respectfully dissent.

 I.
Factual Background

 ¶71
This case has been a moving target. Initially, Oklahoma
 claimed that Jagged misled investors about the location of
 its acreage, the quality and value of that acreage, its
 capital expenditures, and the experience and expertise of its
 staff.

Oklahoma's amended complaint highlighted about a dozen
 excerpts, some paragraphs long, from Jagged's offering
 documents in support of its claims under sections 11,
12(a)(2), and 15 of the Securities Act.

 ¶72
 On appeal, Oklahoma abandoned all allegations related to the
 location of Jagged's acreage. Oklahoma's remaining
 allegations were distilled into eight discrete statements. A
 division of the court of appeals found six of those
 statements to be non-actionable. Okla. Police Pension
 & Ret. Sys. v. Jagged Peak Energy Inc., No.
 19CA1718, ¶¶ 59, 73, 81, 84, 88. All of this means
 that at this point in the litigation, of the thousands of
 statements made in Jagged's 200-plus pages of offering
 materials, only two statements remain at issue.

 ¶73
 The first statement ("Statement 4") appears in a
 section of the prospectus about Jagged's business
 strategies. Jagged said it would:

Maximize returns by optimizing drilling and completion
 techniques through the experience and expertise of our
 management and technical teams. Our experienced
 management and technical teams have a proven track record of
 optimizing drilling and completion techniques to drive well
 and field-level returns. We have experienced a significant
 decrease in our drilling and completion costs since
 2014.[1]

 ¶74
 The second statement ("Statement 2") describes
 Jagged's operations: "Our development drilling plan
 is comprised exclusively of horizontal drilling with an
 ongoing focus on reducing drilling times, optimizing
 completions and reducing costs."

 II.
Overview of Federal Securities Law

 ¶75
 Liability arises under section 11 of the Securities Act when
 a registration statement contains "an untrue statement
 of a material fact" or "omit[s] to state a material
 fact required to be stated therein or necessary to make the
 statements therein not misleading." 15 U.S.C. §
 77k(a). Similarly, under section 12(a)(2), liability arises
 when a prospectus or oral communication includes "an
 untrue statement of a material fact or omits to state a
 material fact necessary in order to make the statements . . .
 not misleading." 15 U.S.C. § 77l(a)(2).
Thus, to state a claim under sections 11 and 12(a)(2), a
 plaintiff must show that a challenged statement or omission
 is both material and misleading. See In re Morgan Stanley
 Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010)
("[T]wo issues are central to claims under sections 11
and 12(a)(2): (1) the existence of either a misstatement or
 an unlawful omission; and (2) materiality.").
"Material" and "misleading" are separate
 elements of a Securities Act claim, each a "distinct
 hurdle[]" that the complaint must clear. In re
 ProShares Tr. Sec. Litig., 728 F.3d 96, 101 (2d Cir.
2013); In re Metro. Sec. Litig., 532 F.Supp.2d 1260,
 1280 (E.D. Wash. 2007).

 ¶76
This case concerns materiality. For purposes of a Securities
 Act claim, a statement is "material only if 'a
 reasonable investor would consider it important in
 determining whether to buy or sell stock.'"
Slater v. A.G. Edwards & Sons, Inc., 719 F.3d
 1190, 1197 (10th Cir. 2013) (quoting McDonald v.
 Kinder-Morgan, Inc., 287 F.3d 992, 998 (10th Cir.
2002)). Generalized statements of corporate optimism that are
 incapable of objective verification-which courts label as
 "puffery"-are not material because "reasonable
 investors do not rely on them in making investment
 decisions." Grossman v. Novell, Inc., 120 F.3d
 1112, 1119 (10th Cir. 1997). Puffery includes "rosy
 affirmation[s] heard from corporate managers" and
 "loosely optimistic statements that are so vague, [and]
 so lacking in specificity" that no reasonable investor
 would find them important. In re Ford Motor Co. Sec.
 Litig., 381 F.3d 563, 570-71 (6th Cir. 2004) (quoting
Shaw v. Digit. Equip. Corp., 82 F.3d 1194, 1217 (1st
 Cir. 1996)). In contrast, statements that are capable of
 objective verification are material. Grossman, 120
 F.3d at 1119. A court evaluating materiality is thus tasked
 with deciding whether a challenged statement has
 "cross[ed] the line from corporate optimism and puffery
 to objectively verifiable matters of fact." In re
 Level 3, 667 F.3d at 1340. Although materiality is a
 mixed question of law and fact often reserved for the trier
 of fact, a court should "not hesitate to dismiss
 securities claims [for failure to state a claim] where the
 alleged

 misstatements or omissions are plainly immaterial."
Slater, 719 F.3d at 1197 (quoting McDonald,
 287 F.3d at 997).

 ¶77
 As the majority notes, a court looks at a challenged
 statement in context to determine whether it is material.
See Maj. op. ¶ 42. But both the division and
 the majority have stretched "context" beyond the
 bounds of federal case law.

 ¶78
 True, a court viewing a challenged statement in context may
 consider the general circumstances under which the statement
 was made: by whom, in response to what, in what form, in what
 industry, and so on. Take, for example, City of Monroe
 Employees Retirement System v. Bridgestone Corp., 399
 F.3d 651 (6th Cir. 2005). There, the relevant context was the
 fact that consumers had filed multiple lawsuits against the
 defendant company. Id. at 672. The Sixth Circuit
 reasoned that against this factual backdrop, a statement in
 the company's subsequent press release could lead a
 reasonable juror to infer that the statement was a
 "direct response to the lawsuits." Id. In
 other words, the lawsuits imbued the challenged statement
 with significance, which is what made the statement material.

 ¶79
 Similarly, in Hughes v. Dempsey-Tegeler & Co.,
 534 F.2d 156, 176 (9th Cir. 1976), the Ninth Circuit
 considered the circumstances in which the challenged
 statement was made, observing that the alleged
 misrepresentations occurred in

 conversations spanning three meetings and that the plaintiff
 was a sophisticated businessman with an extensive business
 background. Id. at 164, 176, 177.

 ¶80
 In Bricklayers & Masons Local Union No. 5 Ohio
 Pension Fund v. Transocean Ltd., 866 F.Supp.2d 223, 243
(S.D.N.Y. 2012), the federal district court considered
 industry-specific context in assessing the materiality of a
 statement. There, the court concluded that the
 defendants' representation about conducting
 "'extensive' training and safety programs"
 was not puffery because "[i]n an industry as dangerous
 as deepwater drilling, it is to be expected that investors
 will be greatly concerned about an operator's safety and
 training efforts." Id. at 233, 244.

 ¶81
 Other federal securities cases reinforce the notion that
 "context" refers to the general circumstances under
 which the statement was made. See, e.g.,
 Grossman, 120 F.3d at 1121 (considering as context
 that the challenged statements were all "contained in
 press releases or interview statements"); In re
 Petrobras Sec. Litig., 116 F.Supp.3d 368, 381 (S.D.N.Y.
2015) (considering as context that the challenged statements
 "were made repeatedly"). Ultimately, when a court
 views a challenged statement in context, it considers whether
 the statement "would have been viewed by the reasonable
 investor as having significantly altered the 'total
 mix' of information made available." In re
 Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 584
(D.N.J. 2001) (quoting TSC Indus., Inc. v. Northway,
 Inc., 426 U.S. 438, 449 (1976)).

 ¶82
 But the consideration of such general circumstances is a
 different endeavor than using historical statements and data
 near a challenged statement in a prospectus to concretize an
 otherwise vague statement of puffery. Federal case law
 expressly holds that courts cannot use neighboring statements
 and data to make an otherwise vague statement somehow
 material. See Freeland, 545 F.Supp.2d at 76
("Combining puffery with accurate historical statements
 does not render the puffery material.") (quoting
XM Satellite, 479 F.Supp.2d at 177));
Picard Chem. Inc. Profit Sharing Plan v. Perrigo
 Co., 940 F.Supp. 1101, 1122 (W.D. Mich. 1996) (same).
Under federal case law, puffery does not become actionable
 when it is "couched between statements of fact and
 offered for context." In re Diebold Nixdorf, Inc.,
 Sec. Litig., No. 19-CV-6180, 2021 WL 1226627, at *10
(S.D.N.Y. Mar. 30, 2021). The puffery remains general,
 "which is what prevents [it] from rising to the level of
 materiality required to form the basis for assessing a
 potential investment." Id. (quoting Ind.
 Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 97-98 (2d
 Cir. 2016)).

 ¶83
 Accordingly, when vague statements of corporate optimism and
 historical statements of fact appear together, a court
 evaluating materiality should assess such statements
 separately. See Abramson v. Newlink Genetics Corp.,
 965 F.3d 165, 173 (2d Cir. 2020) (concluding that
 defendants' general descriptions of its pharmaceutical
 trial results were not puffery);

In re DXC Tech. Co. Sec. Litig., No. 1:18-cv01599,
 2020 WL 3456129, at *8 (E.D. Va. June 2, 2020), aff'd
 sub nom. KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th
 601 (4th Cir. 2021) (holding that plaintiffs failed to allege
 facts that took defendant's general statements
 accompanying revenue projections out of the category of
 non-actionable puffery). A court should not, however, use the
 historical statements of fact to render an otherwise vague
 statement of corporate optimism material.

 ¶84
 Examining the general context of a statement to evaluate its
 materiality is also distinct from relying on a
 plaintiff's allegations that the challenged statement was
 misleading when made; such allegations do not make
 non-actionable puffery material. Rather, whether a statement
 is material is a separate analysis from whether a statement
 is misleading. See In re Metro Sec. Litig., 532
 F.Supp.2d at 1280 ("A [s]ection 11 claim has two
 elements": (1) the plaintiff must prove that the
 registration statement contains a misstatement, and (2) the
 plaintiff must prove the misstatement was material). Federal
 courts reject attempts to conflate these two elements. For
 example, in Indiana Public Retirement System, 818
 F.3d at 97, the Second Circuit rejected the plaintiffs'
 contention that general statements about the defendants'
 commitment to ethics and integrity were material. Recognizing
 that such general statements typically constitute puffery,
 the plaintiffs argued that the challenged statements were
 nonetheless actionable because the defendants were
 "aware of facts undermining [its] positive
 statements." Id. Notably, the Second

 Circuit rejected plaintiffs' attempt to rely on
 allegations that the statements were misleading to prove that
 the statements were material: "Plaintiffs' claim
 that these statements were knowingly and verifiably false
 when made does not cure their generality, which is what
 prevents them from rising to the level of materiality
 required to form the basis for assessing a potential
 investment." Id. at 97-98 (quoting City of
 Pontiac Policemen's & Firemen's Ret. Sys. v. UBS
 AG, 752 F.3d 173, 183 (2d Cir. 2014)).

 III.
Analysis

 ¶85
 In concluding that Statements 4 and 2 are material, both the
 division and the majority departed from federal precedent.

 ¶86
 First, as discussed above, a court evaluating materiality
 must decide when a challenged statement "cross[es] the
 line from corporate optimism and puffery to objectively
 verifiable matters of fact." See In re Level 3,
 667 F.3d at 1340. Here, the division used the surrounding
 historical statements and data to nudge Statement 4 across
 the line. In its arguments before the division, Oklahoma
 claimed that Jagged's statement about
 "[m]aximiz[ing] returns by optimizing drilling and
 completion techniques through the experience and expertise of
 [its] management and technical teams" was misleading.
But in assessing the materiality of that statement, the
 division reasoned that sentence was "buttressed" by
 neighboring statements that Jagged's teams have a
 "proven track record" of optimizing drilling

 and completion techniques. Okla. Police Pension,
 ¶ 75. In turn, the division reasoned, Jagged's
 "proven track record" statement was not puffery
 because it was "followed by the specific claim that
 Jagged 'experienced a significant decrease in [its]
 drilling and completion costs since 2014.'"
Id. at ¶ 78. And this claim, in turn, was
 "made just after Jagged set[] forth very specific
 numerical data showing a decline in average drilling and
 completion costs from 2014 to November 30, 2016."
Id. Through this chain of reasoning, the division
 concluded that a general statement of corporate optimism was
 rendered material when tethered to nearby data and historical
 statements. The division acknowledged that it relied on
 neighboring data in its materiality analysis when it observed
 that Jagged's use of the phrase "proven track
 record" in its prospectus (a phrase deemed in federal
 court cases to be immaterial puffery) "was made in
 connection with measurable results." Id. at
 ¶ 78 n.8.

 ¶87
 The division's reliance on neighboring statements and
 data departed from federal precedent. See Freeland,
 545 F.Supp.2d at 76 ("Combining puffery with accurate
 historical statements does not render the puffery
 material.") (quoting XM Satellite, 479
 F.Supp.2d at 177). If the historical data surrounding
 Statement 4 were false-and the majority acknowledges it is
 not, see Maj. op. ¶ 35-the division could have
 held that the historical data itself was material and
 misleading.

Instead, the division relied on nearby historical data to
 concretize an otherwise vague puffing statement about
 Jagged's "expertise and experience."

 ¶88
 The majority does not disavow the division's approach.
Instead, it compounds the division's error by looking to
 Oklahoma's other allegations suggesting that Statement 4
 was misleading. See Maj. op. at ¶ 48
("But that is not all that Oklahoma alleged. . . .
Oklahoma also alleged that known historical and objectively
 verifiable facts and data could plausibly show that these
 general allegations were misleading at the time of the
 IPO and that defendants knew that they were.") (emphasis
 added). The majority adopts the same approach to Statement 2,
 again relying solely on allegations that Statement 2 was
 not true-not that Statement 2 was material.
See id. at ¶ 49 ("Specifically,
 the facts set forth above in connection with our analysis of
 Statement 4, if true, can plausibly establish that Jagged, in
 fact, was not focused on optimizing completions and
 reducing costs. Indeed, the alleged facts, which are
 verifiable . . ., suggest the opposite.") (emphases
 added). Notably, the majority does not rely on the statements
 Oklahoma actually challenged. Indeed, the majority
 acknowledges that those challenged statements, standing
 alone, are not actionable. It instead looks to Oklahoma's
 allegations concerning the misleading nature of
 those allegations to conclude that the statements were
 material. But as discussed above, those are separate
 hurdles.

 ¶89
 Both the division's approach and the majority's
 approach deviate from federal securities case law at a time
 when uniformity is increasingly important. In 2018, the
 United States Supreme Court confirmed that state courts have
 concurrent jurisdiction over Securities Act claims. See
Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund, 138 S.Ct.
 1061, 1069 (2018). Since that decision, the volume of section
 11 cases filed in state courts has increased. See Michael
 Klausner et al., State Section 11 Litigation in the Post-Cyan
 Environment (Despite Sciabacucchi), 75 Bus. Law. 1769,
 1774 (2020). I am concerned that today's decision lowers
 the bar and invites plaintiffs alleging Securities Act
 violations to forum shop in Colorado state courts.

 ¶90
 As a practical matter, the majority's ruling today forces
 this particular litigation forward. As the majority observes,
 materiality "will rarely be dispositive in a motion to
 dismiss." Maj. op ¶ 40 (quoting Morgan
 Stanley, 592 F.3d at 360). But federal courts routinely
 dismiss cases at the motion to dismiss stage on materiality
 grounds. See, e.g., Grossman, 120 F.3d at
 1121-22; In re Level 3, 667 F.3d at 1340;
Barilli v. Sky Solar Holdings, Ltd., 389 F.Supp.3d
 232, 252-53 (S.D.N.Y. 2019). Such dismissals reflect a
 careful balance between protecting plaintiffs' access to
 courts and protecting defendants from expensive yet meritless
 litigation. ¶91 Consistent with federal securities case
 law, I would hold that Statements 4 and 2 are non-actionable.
Federal courts have routinely held that statements about

"experience and expertise" or "proven track
 record" are immaterial puffery. See, e.g.,
 In re Level 3, 667 F.3d at 1340 (concluding
 defendants' statement that it had "proven
 integration experience" was puffery); City of Omaha
 Police & Fire Ret. Sys. v. Evoqua Water Techs.
 Corp., 450 F.Supp.3d 379, 400 (S.D.N.Y. 2020)
(concluding defendant's statement that it has an
 "[e]xperienced management team with proven operational
 capabilities" was puffery); Barilli, 389
 F.Supp.3d at 252-53 (concluding defendant's statements
 about its chief executive officer's "professional
 history and management abilities" and the company's
 "proven track record" were puffery).

 ¶92
 Similarly, federal courts have found assertions about a
 company's ongoing "focus" to be puffery.
See, e.g., In re Level 3, 667 F.3d at 1340
(concluding defendant's statement that "this year is
 really focused on integration" was puffery); ECA,
 Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase
 Co., 553 F.3d 187, 206 (2d Cir. 2009) (concluding
 defendant's representation that it would "focus on
 financial discipline" was puffery). Indeed, statements
 regarding "focus" "are typical of the kind of
 'self directed corporate puffery' and sales talk that
 courts . . . have shielded from liability." In re
 Stone & Webster, Inc., Sec. Litig., 253 F.Supp.2d
 102, 117 (D. Mass. 2003) (quoting Carney v. Cambridge
 Tech. Partners, Inc., 135 F.Supp.2d 235, 245 (D. Mass.
2001)).

 ¶93
 In sum, I agree with the district court in this case and
 would hold that Statements 4 and 2 are non-actionable,
 immaterial puffery. As a result, I would not reach
 Jagged's hindsight pleading argument.

 IV.
Conclusion

 ¶94
 I acknowledge this is a close case. To prevail on a claim
 under the Securities Act, a complaint must sufficiently plead
 that a challenged statement is both material and misleading.
These are separate hurdles. Vague statements of corporate
 optimism cannot be propped up by nearby historical statements
 and data, and such puffery cannot be rendered material by
 looking to a plaintiff's separate allegations that the
 statements are misleading. Because the majority opinion
 adopts a method of analyzing materiality that departs from
 federal precedent, I respectfully dissent.

 ¶95
 I am authorized to state that CHIEF JUSTICE BOATRIGHT joins
 in this dissent.

---------

[1] Specifically, we granted certiorari to
 review the following issues:

1. Whether the court of appeals departed from federal
 caselaw on the Securities Act of 1933 when it (a) held that
 immaterial "puffery" statements may become material
 due to nearby historical or measurable information, and (b)
 allowed plaintiff to plead claims based on hindsight.

2. Whether the court of appeals erred by reversing the
 district court based on a theory plaintiff never
 raised.

[1] The bold font appears in the original
 prospectus. Notably, at the court of appeals, Oklahoma
 focused solely on the bolded sentence about
 "maximiz[ing] returns" through the "experience
 and expertise" of its staff. In its opinion, however,
 the division emphasized a different part of Statement 4 that
 did not appear in Oklahoma's brief: that Jagged's
 teams "have a proven track record" of optimizing
 drilling. Okla. Police Pension, ¶ 78.

---------